**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | NO. 3:CR-10-75 |
| | (JUDGE CAPUTO) |
| ANTHONY J. MUNCHAK and ROBERT C. CORDARO, | |
| Defendants. | |

## MEMORANDUM

Presently before the Court is Robert Cordaro's ("Cordaro") motion for leave to conduct discovery. (Doc. 356.)  In his discovery motion, Cordaro seeks to have members of the U.S. Attorney's Office and other officials not involved in his federal prosecution respond to interrogatories and to submit to depositions by written questions.  Because Cordaro lacks any factual basis to support his discovery request, the motion for leave to conduct discovery will be denied.

Also before the Court are motions for new trial filed by Anthony Munchak ("Munchak") and Cordaro (collectively, "Defendants"). (Docs. 326; 338.) Defendants argue that they are entitled to a new trial for three reasons.  First, Defendants assert that a new trial is warranted based on newly discovered evidence pursuant to Federal Rule of Criminal Procedure 33.  Second, Defendants argue that their due process rights were violated as a result of the Government's use at trial of testimony that it knew or should have known was perjured.  Lastly, Defendants contend that the prosecution violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  Because Defendants fail to make the necessary showing for a new trial based on newly discovered evidence under Rule 33, that the Government's witnesses provided perjured testimony at trial, or that the prosecution suppressed evidence in violation of *Brady*, the motions for new trial will also be denied.

### I. Background

Munchak and Cordaro were indicted on March 16, 2010 for conduct relating to their positions as Lackawanna County commissioners. (Doc. 1.)  A federal grand jury returned a superseding indictment on October 5, 2010. (Doc. 47.)  Subsequently, the Second Superceding Indictment was returned against Munchak and Cordaro on March 29, 2011. (Doc. 94.)  Munchak and Cordaro proceeded to trial in June 2011 on the Second Superseding Indictment.

Following a two week jury trial, Munchak was convicted of the following offenses: conspiracy to commit theft or bribery in violation of Title 18, United States Code, Section 371 (Count 13); bribery in violation of Title 18, United States Code, Section 666(a)(1)(B) (Counts 14-15); conspiracy to commit extortion under color of official right in violation of Title 18, United States Code, Section 1951(a) (Count 19); extortion under color of official right in violation of Title 18, United States Code, Section 1951 (Counts 22-23); subscribing and filing a materially false tax return in violation of Title 26, United States Code, Section 7206(1) (Count 37); and income tax evasion in violation of Title 26, United States Code, Section 7201 (Count 40).  Cordaro, on the other hand, was convicted of conspiracy to commit theft or bribery in violation of Title 18, United States Code, Section 371 (Count 13); bribery in violation of Title 18, United States Code, Section 666(a)(1)(B) (Counts 17-18); conspiracy to commit extortion under color of official right in violation of Title 18, United States Code, Section 1951(a) (Count 19); extortion under color of official right in violation of Title 18, United States Code, Section 1951 (Counts 20 and 21); conspiracy to commit money laundering in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957 (Count 25); money laundering in violation of Title 18, United States Code, Section 1956(A)(1)(B)(i) (Counts 26-28), racketeering in violation of Title 18, United States Code, Section 1962(c) (Count 31); conspiracy to commit racketeering in violation of Title 18,

United States Code, Section 1962(d) (Count 32); conspiracy to defraud the United States in violation of Title 18, United States Code, Section 371 (Count 33); subscribing and filing materially false tax returns in violation of Title 26, United States Code, Section 7206(1) (Counts 34-36); and income tax evasion in violation of Title 26, United States Code, Section 7201 (Counts 38-39).

A Judgment was entered against Cordaro on February 13, 2012. (Doc. 267.) Cordaro was sentenced to a term of imprisonment of 132 months.  As to Munchak, a Judgment was entered on February 14, 2012, and he was sentenced to an 84 month term of imprisonment. (Doc. 269.)

Munchak and Cordaro then appealed to the United States Court of Appeals for the Third Circuit. *See United States v. Munchak*, 527 F. App'x 191 (3d Cir. 2013).  The Third Circuit affirmed Munchak and Cordaro's convictions and sentences on May 31, 2013. *See id*. at 193-95.[1]  The Third Circuit issued a certified copy of its Judgment in lieu of a formal mandate on July 8, 2013. (Doc. 298.)

On January 6, 2014, Munchak filed his motion for new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. (Doc. 326.)  The Government filed its brief in opposition to Munchak's motion on January 27, 2014. (Doc. 333.)  On February 24, 2014, Cordaro joined Munchak's motion for new trial. (Doc. 338.)  On March 17, 2014, Munchak filed a reply brief in further support of his motion. (Doc. 351.)  The Government filed an opposition brief to Cordaro's motion on May 12, 2014. (Doc. 364.)  On July 2, 2014, Munchak was granted leave to file a supplemental brief in support of his motion. (Docs. 379; 380.)  And, Cordaro filed his reply brief on July 9, 2014. (Doc. 381.)

---

[1] The Third Circuit did, however, remand for a calculation of the proper amount of restitution that should be imposed against Cordaro on Count 33 of the Second Superseding Indictment. *See Munchak*, 527 F. App'x at 196-98.

Additionally, on March 3, 2014, Cordaro filed a motion for extension of time to "permit me to file evidence" in support of his motion for new trial. (Doc. 344.)  Cordaro's motion was granted and he was given until April 28, 2014 to submit such evidence. (Doc. 347.) Cordaro, however, did not file any supporting evidence prior to this deadline.  Rather, on May 5, 2014, Cordaro filed a Motion for Leave to Conduct Discovery. (Doc. 356.) Specifically, Cordaro requests that he be permitted "to take the depositions by written questions . . . of District Attorney John Morganelli, to Detective Robert Egan, to Bethlehem Township Solicitor John Harrison, and to former FBI Special Agent Wevedau." (*Id.* at ¶ 2.) Cordaro further requests leave "to submit interrogatories . . . to United States Attorney Peter J. Smith, Assistant U.S. Attorney Bruce D. Brandler, and/or to an Assistant U.S. Attorney designated by USA Smith from the U.S. Attorney's office in Scranton, Pennsylvania." (*Id.* at ¶ 3.)  The Government filed its brief in opposition to Cordaro's discovery motion on May 12, 2014. (Doc. 364.)  Cordaro's reply brief in further support of his discovery motion was filed on June 17, 2014. (Doc. 373.)

The motions for new trial and Cordaro's discovery motion are thus fully briefed and ripe for disposition.

## II. Discussion

As indicated, pending before the Court are Cordaro's motion for leave to conduct discovery and Defendants' motions for new trial.  Cordaro's discovery motion will be addressed first.

## A.      Cordaro's Discovery Motion

Cordaro's discovery motion seeks to have members of the U.S. Attorney's Office and other officials not involved in his federal prosecution, *i.e.*, District Attorney John Morganelli, Detective Robert Egan, and Solicitor John Harrison, respond to interrogatories and to submit to depositions by written questions.  Specifically, Cordaro's discovery requests

4

involve the indictment of P.J. McLaine ("McLaine") and a purported investigation of Al Hughes ("Hughes"), two witnesses that testified against him at trial.

With respect to the discovery related to McLaine, Cordaro argues that "there are fair questions as to whether any aspects of the grand jury's investigation- including calling McLaine as a witness before the grand jury- were deferred until after McLaine testified against Cordaro in June 2011." (Doc. 357, 4.) Cordaro further contends that:

> there is a reasonable basis for the request in this motion for discovery to determine if McLaine had been a subject of this investigation as of the date of the trial in his (Cordaro's) case and, if so, whether the government had knowledge of such investigation, and, further, whether the government had in any way suggested or implied to the prosecutor handling the grand jury investigation that the indictment in that case should be delayed until after the trial in his (Cordaro's) case.

(*Id*. at 5-6.)

Cordaro's motion also requests discovery of a purported investigation of Hughes. While Cordaro concedes that he cannot substantiate that Hughes is subject to an investigation, he nevertheless argues that "he should be permitted by this Court to obtain discovery to determine whether this information is correct." (*Id*. at 7.) And, if he is permitted to conduct discovery, Cordaro argues that he will "attempt to ascertain when this investigation began and whether anyone on the government's trial team had any knowledge of such an investigation at the time of his (Cordaro's) trial in June 2011." (*Id*.)

While Cordaro does not cite any binding precedent in support of the relief sought, he argues that his discovery request is proper pursuant to the United States Court of Appeals for the Tenth Circuit's reasoning in *United States v. Velarde*, 485 F.3d 553, 559 (10th Cir. 2007). *Velarde*, however, counsels against granting Cordaro the relief sought in this case.

In *Velarde*, the defendant was convicted by a jury of sexually abusing a minor within

Indian country in violation of federal law. *See Velarde*, 485 F.3d at 554.[2]  There were no witnesses to the crime, nor was there corroborating medical evidence. *See id*.  Thus, the defendant was convicted almost entirely on the minor's testimony. *See id*.  Three years after he was convicted, the defendant filed a motion for new trial based on newly discovered evidence. *See id*. at 554-55.  Specifically, he claimed that "in the days immediately preceding his second trial, [the minor] falsely accused her school teacher and the school's vice principal of inappropriately touching her." *Id*. at 555.  And, as the case was largely based on the credibility of the minor's testimony, the defendant argued that false accusations of inappropriate conduct would have impeached the minor. *See id*.  In support of his motion, the defendant attached the affidavit of Phil Gallegos ("Gallegos"), a teacher at the minor's school who was the union representative of the teacher the minor falsely accused. *See id*.  Gallegos testified in the affidavit that he told an FBI Agent about the false accusations before the second trial against the defendant. *See id*.  But, in opposition to the defendant's motion, the Government submitted the FBI Agent's affidavit which denied that he had any conversations or knowledge of the minor's false accusations prior to the second trial. *See id*.   The defendant thus moved the court to issue subpoenas to compel the attendance of Gallegos, the minor, and the minor's principal, as well as the accused teacher and vice principal at an evidentiary hearing.  The subpoenas were never issued, however, and the district court denied the defendant's motion for new trial. *See id*. at 557.

On appeal, the Tenth Circuit addressed whether the defendant was entitled to discovery, and the Court of Appeals held that the district court erred by failing to grant leave

---

[2]  The defendant in *Velarde* was tried twice.  The Tenth Circuit reversed on appeal following the conviction in the first trial on the basis that the district court erroneously admitted expert testimony concerning the minor's propensity for truthtelling. *See Velarde*, 485 F.3d at 554.  The Government elected to retry the defendant, and the second trial again resulted in a conviction. *See id*.  The Tenth Circuit subsequently affirmed the conviction in the second trial. *See id*.

to conduct discovery. *See id*. at 559. The Tenth Circuit stated that the case law on when it is appropriate to authorize leave to conduct discovery in support of a motion under Federal Rule of Criminal Procedure 33 is "obscure and apparently not well understood." *Id*. Nevertheless, the court analogized a Rule 33 motion to a habeas corpus petition, and, in habeas proceedings, the Tenth Circuit noted that a "court is required to conduct [an] evidentiary hearing only if the admissible evidence presented by petitioner, if accepted as true, would warrant relief as a matter of law." *Id*. at 559-60. In *Velarde*, though, the court emphasized that the defendant, by his own admission, could not satisfy this standard. The Tenth Circuit resolved this dilemma by finding that in the "rare case" where "a defendant who is unable to submit evidence to the court sufficient to warrant an evidentiary hearing [ ] is able to make a showing that further investigation under the court's subpoena power very likely would lead to the discovery of such evidence," the proper course is for the defendant to request, and the court to grant, leave to conduct discovery. *Id*. at 560.

The Tenth Circuit then concluded that the defendant presented the "rare case" in which discovery was appropriate. *See id*. at 560-61. The court stated that "[i]f the evidence proffered by [the defendant's] counsel is accurate, it is more likely than not that [the minor] in fact made allegations of inappropriate touching against her teacher and principal, and that the school investigated these allegations and found them false." *Id*. at 561. As a result, the Tenth Circuit emphasized that discovery would not be "*a mere fishing expedition based on the defendant's mere hopes of finding exculpatory evidence*. Rather, *there is a firm evidentiary basis for believing such evidence likely exists*." *Id*. (emphasis added).

Assuming the standard set forth by the Tenth Circuit in *Velarde* is applicable in this Circuit, Cordaro is not entitled to the requested discovery. The discovery sought in *Velarde* involved the issuance of subpoenas to testify at an evidentiary hearing with regard to a specific factual dispute relating to the defendant's newly discovered evidence. And, in that

case, if the defendant's newly discovered evidence was accepted as true, it may well have warranted relief as a matter of law.  Here, Cordaro seeks discovery not for the purpose of resolving a factual dispute; rather, discovery is sought solely for the purpose of uncovering evidence related to speculative allegations of governmental misconduct unsubstantiated by evidentiary support.  Thus, unlike *Velarde* where the defendant had a "firm evidentiary basis" to support his claim that such evidence existed, Cordaro in this case is "on a . . . fishing expedition" with the hope that discovery will produce a basis for relief. *Cf. Velarde*, 485 F.3d at 561.  Indeed, a review of Cordaro's supporting brief demonstrates that his discovery motion is a speculative fishing mission lacking evidentiary foundation.  For example, Cordaro argues in his motion that there is a reasonable basis for his discovery request "to determine if McLaine had been a subject of this investigation . . . ." (Doc. 357, 5.)  Similarly, with respect to Hughes, Cordaro asserts if he is permitted discovery "he will attempt to ascertain when this investigation began and whether anyone on the government's trial team had any knowledge of such an investigation . . . ." (*Id*. at 7.) Likewise, Cordaro indicates that depending on the discovery responses, he "*might then be in a position to provide specific support for his argument*" that the Government failed to provide *Brady* material. (*Id*. at 8 (emphasis added).)  Cordaro's submissions confirm that he lacks any factual basis to support his motion and that his request for discovery is nothing more than "a . . . fishing expedition."  Additionally, even if Cordaro's unsupported allegations are accepted as true, he would not be entitled to relief as a matter of law under Rule 33 or *Brady* because it is not probable that such evidence would have produced an acquittal, nor is there a reasonable probability that had such evidence been disclosed to the defense the result of the trial would have been different.  Accordingly, pursuant to *Velarde*, Cordaro fails to present the rare case where leave to conduct discovery is warranted.  Cordaro's discovery motion will therefore be denied.

8

**B.     Motions for New Trial**

Defendants seek a new trial based on newly discovered evidence, a deprivation of their due process rights, and the suppression of evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  According to Defendants, newly discovered evidence exists that the partners of Highland Associates ("Highland"), Donald Kalina ("Kalina"), Domenic Provini ("Provini"), and Kevin Smith ("Smith") (collectively, the "Highland partners"), provided false testimony at trial.  Relevant to the instant motions is the Highland partners' testimony that Defendants demanded and accepted three $30,000.00 cash payments in 2005.

First, however, in May 2004, Provini testified that he was approached by McLaine and informed that Highland needed to make a cash payment to the majority County Commissioners, *i.e.*, Munchak and Cordaro, if Highland wanted to continue doing work for Lackawanna County (the "County"). (Doc. 207, "*Provini Test.*," 201:16-202:1.)  Provini discussed the demand with Kalina and Smith, but they declined to make the payments because Highland was doing little work for the County. (*Id*. at 203:5-11.)

Thereafter, in spring 2005, Kalina received a demand for cash from Munchak. (*Id*. at 203:19-21.)  Kalina, Provini, and Smith discussed the demand, and they decided that they would make a $30,000.00 cash payment to Defendants, with each Highland partner contributing $10,000.00. (*Id*. at 207:19-208:2.)  Kalina gave the $30,000.00 in cash to Munchak at a lunch in May 2005. (Doc. 207, "*Kalina Test. June 9, 2011*," 259:6-261:7.) Cordaro called Kalina shortly thereafter to thank him. (*Id*. at 261:8-19.)

In June 2005, Kalina received another call from Munchak demanding cash. (*Id*. at 261:20-262:1.)  The Highland partners again agreed to make a $30,000.00 payment, with each partner contributing $10,000.00. (*Id*. at 263:9-10.)

And, in November 2005, Kalina received a third call from Munchak requesting

additional cash. (*Id*. at 265:10-22.)   The partners again agreed to each contribute $10,000.00 to make the payment, but they decided that this would be the final payment. (*Id*. at 265:24-266:4.) Unlike the first two payments, this payment was delivered to Cordaro. (*Id*. at 267:17-20.)

At trial, the Highland partners testified that the payments were made to Defendants in 2005 because they were owed approximately $1.3 million by the County when Munchak demanded payment in May 2005. (*Id*. at 272:14-20.)   For example, Smith testified that Highland was "owed 1.3 million dollars in fees" when Munchak first asked for payment in 2005. (Doc. 207, "*Smith Test.*," 153:3.)  Provini testified that Highland's work for the County increased dramatically from 2004 to 2005, and the County owed Highland $1.2 or $1.3 million when Munchak demanded cash in May 2005. (*Provini Test.*, 204:10-18, 206:23-25.) Provini further testified that he did not want to make the payment when it was first demanded, but he thought he had to because of Highland's contracts with the County and because he wanted to get the $1.3 million. (*Id*. at 244:16-20, 245:21-23.)  Kalina likewise testified that the County owed Highland approximately $1.3 million in spring 2005. (*Kalina Test. June 9, 2011*, 256:18-19.)  Kalina also stated that if Highland lost the contracts with the County it would be forced to lay-off employees. (*Id*. at 257:7-10.)

Munchak and Cordaro testified in their own defenses at trial.  Munchak denied ever calling Kalina and asking for cash. (Doc. 168, "*Munchak Test.*," 33:17-20.)  Munchak further denied ever receiving any cash payments from Kalina. (*Id*. at 4:23-5:3,  33:21-34:2.) Cordaro similarly denied receiving an envelope filled with cash from Kalina. (Doc. 194, "*Cordaro Test.*," 50:15-51:2, 204:25-205:3, 206:2-4.)  Cordaro also denied that Munchak ever came to him about Highland.  Likewise, Cordaro denied knowing that Munchak was receiving cash from Kalina. (*Id*. at 207:6-12.) Nonetheless, at the conclusion of trial, the jury found both Munchak and Cordaro guilty of bribery and extortion regarding the demand and

10

payment of cash from the Highland partners in 2005. (Docs. 132; 133.)

Defendants now contend, however, that newly discovered evidence demonstrates that the Highland partners testified falsely at trial with respect to: (1) the impact a refusal to make the demanded payments would have had on Highland's business; and (2) the amount of money owed Highland by the County in spring 2005.

As to newly discovered evidence related to Highland's business in 2005, Defendants state:

> [The Highland partners] manufactured a danger of large-scale layoffs that was, the defense now knows, entirely false.  The partners testified that the large receivables left the company vulnerable, threatening its ability to retain and maintain the forty-percent of its local workforce that works on County contracts.  But newly discovered evidence demonstrates that Highland had 2005 revenue of $23.8 million, as reported to a trade journal.  The partners themselves took compensation of $1.3 million each that year.  Those compensation figures included bonuses of approximately $900,000 for each partner.  Even if a $1.3 million receivable had been at risk- and it was not- the risk was small to a company of that size.  The idea that Highland would have laid off 40% of its local staff over a 5.5% decline in revenue is preposterous.

(Doc. 328, 6-7 (internal citations, quotations, and emphasis omitted).)

Second, with respect to the money owed Highland by the County, Defendants argue:

> The County did not owe Highland $1.3 million in April 2005, nor at any other time during that year. . . . Newly discovered evidence shows that the County owed Highland only $95,807.32 at the time of the first alleged payment (approximately mid-May 2005), and never owed Highland a sum even approaching $1.3 million during the relevant time.  Far from holding hostage old invoices, the County was paying Highland promptly and consistently.  For example, the County paid Highland $731,762.02 on seventeen invoices submitted between January 1, 2005 and mid-May 2005- with an average time to payment of twenty-two days.

(Doc. 328, 6 (internal citations and emphasis omitted).)  The thrust of this claim stems from an exchange at trial between the prosecutor and Smith, the first of the Highland partners to testify.  After Smith testified that Highland was "owed 1.3 million dollars in fees" at the time of the first demand in 2005, he was asked:

> Question:    When you say there were [$]1.3 million [in] invoices outstanding, who were those invoices with?
>
> Answer:      They were with the County.

(*Smith Test.*, 154:7-9.) Based on this exchange, Defendants argue that the term "'[i]nvoices outstanding' was the government's own description at trial for the $1.3 million that was owed" Highland from the County. (Doc. 351, 5.) Restated, according to Defendants, "the government defined the money 'owed' as 'invoices outstanding' at the very beginning of the Highland testimony, the witness adopted the definition, and never wavered from it . . . ." (*Id.* at 5.) And, at trial, the Highland partners testified "no fewer than thirteen times" that their motive for making the payments was "because they had a $1.3 million aged receivable from the County." (Doc. 328, 3.)[3] Essentially, Defendants contend that the Highland partners testified that this $1.3 million referred to "payments that were due, whether called 'invoices, or 'receivables' or simply money 'owed'," (Doc. 351, 5), as opposed to the value of future billings.

But, Defendants argue, there was not $1.3 million in outstanding invoices owed Highland by the County in spring 2005. Rather, Defendants emphasize that newly

---

[3]     Testimony by the Highland partners regarding the $1.3 million owed by the County in 2005 includes: (1) "I happened to have the financials on my desk. I pretty much knew what the oldest- which was 1.2 or 1.3 million dollars," (*Provini Test.*, 204:12-14); (2) "[i]n the spring it was 1.3 million outstanding," (*id.* at 221:16); (3) "at that time we had a significant amount of labor expended into the projects that we were working on. It was approximately 1.3 million dollars, in that area, that the county owed us," (*Kalina Test. June 9, 2011*, 256:16-19); (4) "we said, Well, what are we going to do? The county owes us 1.4 million, almost $1.4 million," (*id.* at 256:24-25); (5) "we were still owed a significant amount of money, approximately 1.3 million dollars that has not gone down. So, again, we felt we were being extorted and needed to pay the money," (*id.* at 262:20-23); (6) "[Question] why did you make these payments? [Answer] Because we were scared, as I mentioned before. We had 1.3 million dollars of money that was due to us as we progressed forward with the work. And we were afraid that the contract would be stopped, . . ." (*id.* at 272:14-18); (7) "in April of 2004, we were owed $ 1.3 million. [Question] You had an account receivable in that amount, right? [Answer] Yes, sir," (*Kalina Test. June 10, 2011*, 12:2-4); and (8) "[Question] is it your testimony that your concern was, we were owed $1.3 million and we were afraid Bob Cordaro was going to tell the county not to pay us? [Answer] That's correct." (*id.* at 12:6-9).

discovered evidence[4] confirms that Highland had only $95,807.32 in outstanding invoices to the County as of mid-May 2005 when the first payment was allegedly made to Defendants.   As a result, Defendants reason that because "owed" meant "invoices outstanding" and not the "value of future billings", (Doc. 351, 10), the Highland partners all perjured themselves (or provided false testimony) when they testified that the County owed Highland $1.3 million in spring 2005.   And, in light of this false testimony, Defendants contend that a new trial is warranted for three reasons.   First, Defendants maintain that they are entitled to a new trial based on newly discovered evidence pursuant to Federal Rule of Criminal Procedure 33.   Second, they argue that the Government's use of testimony that it knew or should have known was false violated their due process rights and thus warrants a new trial.   Lastly, Defendants assert that they are entitled to a new trial under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

In opposition, the Government argues that a new trial is not warranted on any of the three grounds which Defendants seek relief.   The Government asserts that the motion for new trial should be denied because Defendants fail to demonstrate that the Highland partners testified untruthfully, nor have they shown that the Government was aware of the purportedly untruthful testimony.   Instead, the Government characterizes Defendants' motion as based on a "dispute between the parties [that] boils down to one of semantics regarding the amount of money 'owed' to the Highland firm by the County when Highland made its payments to Cordaro and Munchak in 2005." (Doc. 364, 8.)   The Government notes that not one of the Highland partners used the phrase "outstanding invoices," and that phrase was instead interjected by the prosecutor during the questioning of Smith.

---

[4]     The "newly discovered evidence" cited in Munchak's submission is a declaration from Thomas Durkin ("Durkin"), Chief Financial Officer of Lackawanna County, indicating that the County did not owe $1.3 million to Highland between August 20, 2004 through July 25, 2005. (Doc. 328, Ex. A, ¶ 5(a).)

Additionally, the Government emphasizes that there is no evidence submitted by Defendants that $1.3 million was not owed to Highland as of May 2005, and it is Defendants' burden to show that this testimony was false.   Moreover, the Government argues that there is no dispute that substantial work was performed by Highland and that $1.3 million was owed to it by May 2005.  Accordingly, the Government contends that whether Highland had invoiced the County for the $1.3 million at the time of the payments was inconsequential to both the motive to make the payments and the jury's verdict.  Thus, the Government concludes that Defendants are not entitled to a new trial under Rule 33, on the basis of a due process violation, or pursuant to *Brady*.

    1.    **Rule 33**[5]

Munchak and Cordaro first seek relief pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure on the basis of newly discovered evidence.  As noted, Defendants claim that newly discovered evidence shows that the County had outstanding invoices to Highland totaling $95,807.32, as opposed to $1.3 million, in mid-May 2005.  This evidence is set forth in Durkin's first declaration. (Doc. 328, Ex. A, ¶5.)  Durkin, however, also submitted a second declaration in which he notes that in May, June, and July 2005, Highland submitted invoices to the County totaling over $1.8 million. (Doc. 333, Ex. D, ¶ 4.)

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). When the motion for new trial is based on newly discovered evidence, the motion "must be

---

[5]    A court need not hold an evidentiary hearing before ruling on a motion for new trial under Rule 33. *See United States v. Herman*, 614 F.2d 369, 372 (3d Cir. 1980); *see also United States v. Jackson*, 427 F. App'x 109, 113 (3d Cir. 2011) ("Having presided over the trial and being intimately familiar with the record, the court was well-situated to rule on the implications of Jackson's belated submissions, and it did not abuse its discretion in declining to conduct an evidentiary hearing.").  Here, based on the record, Defendants' motions for new trial can be resolved without a hearing.

filed within 3 years after the verdict or finding of guilty.  If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case." Fed. R. Crim. P. 33(b)(1).

A defendant seeking a new trial based on newly discovered evidence must satisfy five requirements:

> (a) the evidence must be in fact, newly discovered, *i.e.*, discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on, must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006) (quoting *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir. 1976)).  A defendant "bears a 'heavy burden" to satisfy each of these requirements. *United States v. Brown*, 595 F.3d 498, 511 (3d Cir. 2010) (citing *Cimera*, 459 F.3d at 458).  And, "[i]f just one of the requirements is not satisfied, a defendant's Rule 33 motion must fail." *United States v. Kelly*, 539 F.3d 172, 182 (3d Cir. 2008) (citing *United States v. Jasin*, 280 F.3d 355, 365 (3d Cir. 2002)).  Moreover, "[c]ourts should 'exercise great caution in setting aside a verdict reached after fully-conducted proceedings, and particularly so where 'the action has been tried before a jury.'" *Id*. (quoting *United States v. Kamel*, 965 F.2d 484, 493 (7th Cir. 1992)).

In their submissions, Defendants argue that their motions for new trial are governed by the *Larrison*[6] test and not the five-factor test detailed above. (Doc. 328, 8-11.)  According

---

[6]  The *Larrison* test refers to the United States Court of Appeals for the Seventh Circuit's decision in *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928).  Under *Larrison*, a defendant is entitled to a new trial if "(1) the witness is material and the testimony false; (2) the jury might have reached a different verdict if it knew the testimony was false or if it hadn't heard the testimony; and (3) the defense was taken by surprise by the false testimony or didn't learn of its falsity until after trial." *United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004.  The Seventh Circuit, however, has expressly overruled *Larrison*. *See United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004), *vacated on other grounds*, 543 U.S. 1097, 125

to Munchak, "[t]he Third Circuit and district courts within it have analyzed motions for a new trial based on false testimony using a standard distinct from the standard governing other categories of newly-discovered evidence." (*Id*. at 8.)  Munchak contends that a new trial is required when "(1) the testimony given by a material witness was false; (2) the jury might have reached a different conclusion; and (3) the party seeking a new trial was surprised by the testimony and unable to meet it, or did not know of the falsity until after trial." (*Id*.)  Munchak further notes that the Third Circuit applied this standard in *United States v. Massac*, 867 F.2d 174, 178 (3d Cir. 1989).

I am of the view that the instant motions for new trial are governed by the five-factor test outlined above and not the *Larrison* test.  The Third Circuit has never adopted the *Larrison* test. *See United States v. Huggins*, 392 F. App'x 50, 66 n.13 (3d Cir. 2010) ("We have not yet adopted the *Larrison* test . . . ."); *United States v. Leary*, 206 F. App'x 111, 114 (3d Cir. 2006); *Government of Virgin Islands v. Lima*, 774 F.2d 1245, 1251 n.4 (3d Cir. 1985).  Moreover, even though the Third Circuit applied *Larrison* in *Massac*, the Third Circuit has stated "that our Circuit has refrained from adopting the *Larrison* test, but we nevertheless proceeded to review the district court's application of that standard [in *Massac*] for abuse of discretion because the parties had agreed upon *Larrison* as the appropriate analytical framework." *United States v. Jackson*, 427 F. App'x 109, 112 (3d Cir. 2011) (citing *Massac*, 867 F.2d at 178).  Unlike in *Massac*, the Government here opposes application of *Larrison*.  (Docs. 333, 6-7, n.3; 364, 7.)  And, two district courts in this Circuit have recently rejected the application of *Larrison* to a motion for new trial. *See United States v. St. Vallier*, No. 07-613, 2013 WL 5937006, at *2 n.3 (D.N.J. Oct. 31, 2013); *United States v. Schneider*, No. 10-29, 2013 WL 592148, at *4 (E.D. Pa. Feb. 15, 2013).  However, even analyzing the motions pursuant to *Larrison*, Defendants are not entitled to a new trial.

---

S. Ct. 984, 160 L. Ed. 2d 998 (2005).

Under the five-factor test, Defendants must first show that the evidence is in fact newly discovered.  As the Government assumes that Cordaro discovered this evidence after trial, I will as well.  Nevertheless, the Government argues that Defendants fail to satisfy the remaining criteria to warrant a new trial under Rule 33.  I agree.

First, there are no facts alleged from which to infer Defendants acted with diligence to discover this information prior to trial.  Rather, the only argument with respect to diligence advanced by Defendants is that they "had no reason to request the newly-discovered materials until the Highland partner lied on the stand," and that they cannot be faulted for failing to anticipate that the Highland partners would commit perjury. (Doc. 328, 14.) However, for the reasons explained below, the Highland partners did not testify falsely, and there is nothing in the record indicating that Defendants were unable to obtain financial records from the County or Highland prior to trial.  Thus, Defendants fail to make a sufficient showing of diligence to warrant a new trial under Rule 33.

Second, as explained herein, the Highland partners did not provide false or perjured testimony at trial, and the information about the amount of invoices outstanding would have only been impeachment evidence.  Generally, a new trial is not appropriate under Rule 33 when the new evidence is merely cumulative or impeaching.  Evidence that is impeaching lacks an "exculpatory connection" to the defendant's conduct. *See United States v. Saada*, 212 F.3d 210, 216 (3d Cir. 2000).  The Third Circuit, however, has also indicated that in exceptional circumstances a new trial may be granted on the basis of impeachment evidence alone. *See United States v. Quiles*, 618 F.3d 383, 392 (3d Cir. 2010).  Such a circumstance, though, requires either "(1) a strong exculpatory connection between the new evidence and the charge against defendant, or (2) the new evidence must seriously undermine evidence presented at trial." *United States v. Mensah*, 434 F. App'x 123, 126 (3d Cir. 2011) (citing *Quiles*, 618 F.3d at 392).  "The connection between the new evidence and

17

the verdict must be so strong that it suggests the defendant was wrongly convicted." *Id*.

The new evidence presented in this case by Defendants fails to make such a showing.  Here, at most, the newly discovered evidence would have demonstrated that Highland did not have unpaid submitted invoices of $1.3 million in mid-May 2005.  The evidence, however, would not have demonstrated that Highland had not performed substantial work for the County or that it was owed $1.3 million generally, nor would it have refuted testimony that the Highland partners made the payments out of fear that they would not be paid for work that had already been completed.  Likewise, this evidence does not seriously undermine the evidence presented at trial, nor is it so strong as suggesting that Defendants were wrongfully convicted.

Third, I am not convinced that the evidence regarding the amount of unpaid invoices by the County in mid-May 2005 was material to the Highland partners' motive to make the payments to Defendants because the fact that an invoice had not been submitted does not demonstrate that work had not been performed by Highland for the County.  Nonetheless, even if this evidence was material to the issues involved, Defendants' motion under Rule 33 also fails to demonstrate that the evidence "would probably have produce[d] an acquittal."

"When evaluating whether the evidence is likely to produce an acquittal, the court considers the new evidence in light of all of the evidence presented at trial." *Mensah*, 434 F. App'x at 127 (citing *Kelly*, 539 F.3d at 189).  As explained, Defendants argue that because reference was made to "invoices outstanding" following Smith's testimony that Highland was owed $1.3 million from the County in spring 2005, all subsequent testimony by the Highland partners regarding that sum referred to overdue payments and not the value of future billing.  And, because the new evidence shows only $95,807.32 in invoices outstanding in mid-May 2005, Defendants conclude that this would have "proven that the

government's star immunized witnesses had lied to the very jurors in the box about the central disputed issue in the case," and, as such, would probably have produced an acquittal. (Doc. 328, 16.)

It is not probable that the newly discovered evidence would have produced an acquittal. For one, the reference to "invoices outstanding" was made by the prosecutor during the direct examination of Smith, and none of the Highland partners used that phrase to describe the $1.3 million owed to Highland in spring 2005. (*Smith Test.*, 154:7-9.) Defendants' interpretation of the trial testimony and corresponding extrapolations gleaned from that testimony notwithstanding, the record does not support the conclusion that the other Highland partners adopted this characterization of the $1.3 million. Rather, the Highland partners, as detailed in the margin above, *see supra* note 3, testified that the payments were made to Defendants because they were "owed" $1.3 million by the County in spring 2005. Indeed, not one of the Highland partners used the word "invoice" with respect to that $1.3 million. Accordingly, Defendants' claim that the Highland partners' testimony regarding the $1.3 million related only to overdue payments and not money "owed" Highland generally strains the testimony provided by these witnesses at trial.

Moreover, the new evidence when considered in light of all evidence presented at trial is not likely to have altered the outcome. At trial, the jury was presented with both the Highland partners' claim that payments were made to Defendants and Defendants' denials that payments were ever demanded or accepted from the Highland partners. The Highland partners testified that they yielded to the demand for payments from Munchak in 2005 after rebuffing a similar request the prior year because Highland began to perform significantly more work for the County in 2005. (*Provini Test.*, 201:16-202:1, 206:23-25.) As a result, the Highland partners testified that they acceded to that second demand out of fear that Defendants would keep the County from making payments owed to Highland. (*Kalina Test.*

*June 10, 2011*, 12:5-9.)  Defendants, conversely, both took the stand in their own defense and denied demanding or receiving payments from Highland.  (*Munchak Test.*, 33:17:-34:6; *Cordaro Test.*, 50:15-51:2, 204:25-205:3, 206:2-4.)  The jury was thus squarely faced with determining whether payment was demanded from the Highland partners or whether, as testified by Defendants, the Highland partners' testimony was false.  In finding Defendants guilty, the jury credited the testimony of the Highland partners and concluded that Defendants did, in fact, demand and accept payment from the Highland partners.  The amount of outstanding invoices at the time the payments were made would not alter this determination and is not of significance to the jury's verdict in light of this evidence and all other evidence presented at trial.  Defendants, therefore, are not entitled to a new trial pursuant to the Third Circuit's five-factor test for motions under Rule 33 based on newly discovered evidence.

Furthermore, even if Defendants' motions are analyzed under the *Larrison* test, Defendants' new evidence does not warrant a new trial.  Under *Larrison*, a defendant need only show that: "(1) A material witness gave false testimony; (2) Without the false testimony, the jury might have reached a different verdict; and (3) The defendant did not know the testimony was false until after the trial." *Massac*, 867 F.2d at 178.

Defendants' motions fail under the first *Larrison* prong.  As stated, the only reference to "invoices outstanding" was made by the prosecutor during Smith's testimony. (*Smith Test.*, 154:7-9.)  Smith testified that the County owed Highland $1.3 million in fees at the time of the payments. (*Id*. at 153:1-3.)  Kalina similarly testified that Highland was owed $1.3 million from the County in spring 2005. (*Kalina Test. June 9, 2011*, 256:19, 256:25, 262:20; *Kalina Test. June 10, 2011*, 12:2.)  Provini likewise testified that the County owed Highland $1.3 million when the first demand for payment was made in 2005. (*Provini Test.*, 204:16.)  Defendants argue, however, that Provini's testimony that the $1.3 million was determined

based on a "receivable report" that Highland published on a monthly basis confirms that he provided false testimony. (*Id*. at 206:15.)  But, as Provini did not provide further explanation about this "receivable report," this reference fails to satisfy Defendants' burden and establish that Provini testified falsely at trial.  Provini did not testify that there were $1.3 million in "invoices outstanding" in 2005, nor did he indicate that the $1.3 million was comprised of unpaid, overdue bills.  Furthermore, Provini testified that Highland was owed this money from the County, and "[a]t that particular time we were out that money.  So that was all our cash out." (*Id*. at 204:16-17.)  This is consistent with testimony from the other Highland partners indicating that the $1.3 million was for work performed. (*Kalina Test. June 9, 2011*, 256:16-19 ("we had a significant amount of labor expended into the projects that we were working on.  It was approximately 1.3 million dollars, in that area, that the county owed us.").)  In view of the record, the newly discovered evidence is insufficient to meet Defendants' burden of establishing that the Highland partners' testimony that they were "owed" $1.3 million by the County was false, or that Provini provided false testimony when he testified at trial about the "receivable report."  As such, Defendants are not entitled to relief under *Larrison*.

Therefore, under either the Third Circuit's five-factor test for a new trial based on newly discovered evidence pursuant to Rule 33 or *Larrison*, Defendants are not entitled to relief.  The motion for new trial based on newly discovered evidence will be denied.

### 2.    Due Process

Defendants next argue that they are entitled to a new trial because the Government's use of testimony that it knew or should have known was false violated their due process rights.  And, based on this use of false testimony, Defendants insist that their convictions must be set aside because there is a "reasonable likelihood that the false testimony . . . affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392,

49 L. Ed. 2d 342 (1976).

In order to obtain a new trial on their due process claim, Defendants must show that: (1) the Highland partners committed perjury; (2) the Government knew or should have known of the perjury; (3) the Highland partners' testimony went uncorrected; and (4) there is a reasonable likelihood that the false testimony could have affected the verdict. *United States v. Hoffecker*, 530 F.3d 137, 183 (3d Cir. 2008); *see also United States v. John-Baptiste*, - - - F.3d - - -, 2014 WL 627685, at *17 (3d Cir. Feb. 19, 2014) (same); *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004) (same). "A witness commits perjury if he or she 'gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *Hoffecker*, 530 F.3d at 183 (quoting *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S. Ct. 1111, 1116, 122 L. Ed. 2d 445 (1993)).

Here, because Defendants fail to satisfy their burden and demonstrate that the Highland partners offered false or perjured testimony, consideration of the remaining elements is not necessary. *See United States v. St. Vallier*, 404 F. App'x 651, 659-60 (3d Cir. 2010). As explained above, the Highland partners testified at trial that they made the payments to Defendants in 2005 out of fear that they would not be paid for work Highland had previously performed for the County. Moreover, not one of the Highland partners used the phrase "invoices outstanding" to characterize the $1.3 million owed Highland at that time. Thus, Defendants' claim that the Highland partners testified only as to overdue invoices as opposed to money owed Highland generally is not established by the record. As such, Defendants fail to establish a violation of their due process rights, and their motions for new trial on this basis will be denied.

### 3.    *Brady*[7]

Defendants also contend that they are entitled to a new trial on the basis that the Government violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).  According to Defendants, the undisclosed *Brady* "evidence includes the County's financial records, and/or Highland's own, demonstrating the nonexistence of the alleged receivable and the regularity of the County's payments; and the Highland records demonstrating its robust financial health and the concomitant falsity of the claim that the receivable put many employees' jobs at risk." (Doc. 328, 12.)  In addition, Cordaro argues that the Government violated *Brady* with respect to the suppression of an investigation of McLaine and the ongoing bank fraud of Hughes. (Doc. 339, 14-21.)  I will address Defendants' common argument first.

In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S. Ct. 1194.  To establish a *Brady* violation, a defendant must prove: (1) "the evidence at issue must be favorable to the defendant;" (2) "it must be material;" and (3) "it must have been suppressed by the prosecution." *United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008) (citing *United States v. Pelullo*, 399

---

[7]    According to the Third Circuit, a defendant is entitled to a hearing when there is a factual issue regarding whether a *Brady* violation occurred and the claim is not frivolous or palpably incredible. *Gov't of Virgin Islands v. Martinez*, 780 F.2d 302, 306 (3d Cir.1985) (citing *United States v. Alexander*, 748 F.2d 185, 193 (4th Cir. 1984); *United States v. Dansker*, 565 F.2d 1262 (3d Cir. 1977)); *see also United States v. Reyeros*, 537 F.3d 270, 284 n.18 (3d Cir. 2008) ("Because they did not make a threshold showing that a material fact was in dispute, their demand for an evidentiary hearing warranted no more consideration than the District Court gave it.").  For the reasons explained in the text, Defendants fail to set forth colorful claims under *Brady*.  As such, an evidentiary hearing is not warranted.

F.3d 197, 209 (3d Cir. 2005); *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir. 1991)).

"Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule."

*United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

Additionally, under *Brady*, the Government has an affirmative duty to disclose such evidence even where there has not been a request for it by the defendant. *Johnson v. Folino*, 705 F.3d 117, 128 (3d Cir. 2013) (quoting *Strickler v. Greene*, 527 U.S. 263, 280, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).  Moreover, "the government's duty to disclose under *Brady* reaches beyond evidence in the prosecutor's actual possession." *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006).  That is, "the Supreme Court has made clear that prosecutors have 'a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Id*. (quoting *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)).  Conversely, however, the Third Circuit has emphasized that "'the government is not obliged under *Brady* to furnish a defendant with information which he already has, or with any reasonable diligence, he can obtain himself.'" *Pelullo*, 399 F.3d at 202 (quoting *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984)).

Here, neither Munchak nor Cordaro argue that the Government had actual knowledge or possession of County and/or Highland financial information but nonetheless suppressed these records, and the Government asserts (and nothing in the record indicates to the contrary) that Defendants were provided with access to all the financial records the prosecution acquired from the County and Highland. (Doc. 328, 13, n.18 ("Mr. Munchak need not establish that the prosecutors had actual knowledge of the undisclosed information, although the record justifies further examination of that factual question. Certainly the County's financial records were 'readily available' to the prosecutors."); Doc. 339, 11 ("The undisclosed evidence includes county financial records confiscated from

county project manager Carl Pettinato that would have demonstrated that no alleged 'aged' receivable existed."); Doc. 364, 15 ("The government gave the defense access to all the financial records it had obtained from the County and Highland, . . .").)  And, in any event, a claim that the Government had actual possession of these financial records without any facts supporting such a claim would fail because mere speculation that the Government suppressed evidence is insufficient to establish a *Brady* violation. *See Trottie v. Stephens*, 720 F.3d 23, 252 (5th Cir. 2013) (citing, *inter alia*, *Hughes v. Johnson*, 191 F.3d 607, 629-30 (5th Cir. 1999) (holding that speculation of suppression is insufficient to establish a *Brady* claim)); *United States v. Driver*, 798 F.2d 248, 251 (7th Cir. 1986) ("unsupported assertion that the government suppressed evidence . . . is insufficient to establish a *Brady* violation.").

Rather than arguing that the Government had actual knowledge or possession of the County and Highland's financial records but nevertheless suppressed such evidence, Defendants indicate that a *Brady* violation occurred because these records were "readily available" to the prosecution. (Doc. 328, 13 n.18.)  Defendants' submissions thus appear to suggest that the Government had constructive possession of the County and Highland's financial records.  And, by not disclosing "[e]vidence about Highland's internal accounting, its robust financial history, and the County's prompt payment history," (Doc. 351, 18), Defendants conclude that a new trial is warranted under *Brady*.

Defendants' motion for a new trial with respect to their claim that the Government violated *Brady* by failing to disclose County and/or Highland financial information will be denied.  Under *Brady*, the lack of actual knowledge by a prosecutor of exculpatory material, as stated, does not automatically defeat a *Brady* claim because a prosecutor is also obligated to produce certain evidence "constructively in its possession or accessible to it." *Perdomo*, 929 F.2d at 970.  "Constructive possession," according to the Third Circuit,

means that "although a prosecutor has no actual knowledge, he should nevertheless have known that the material at issue was in existence." *United States v. Joseph*, 996 F.2d 36, 39 (3d Cir. 1993).   As a result, "a federal prosecutor is charged with knowledge of information possessed by other agents of the federal government when those agents are a part of a 'prosecution team,' which includes federal personnel involved in the investigation as well as the prosecution of a case." *Reyeros*, 537 F.3d at 281 (citing *Pelullo*, 399 F.3d at 216-18); *Risha*, 445 F.3d 298, 303 (duty to learn of "any favorable evidence known to the others acting on the government's behalf in the case, including the police."). Three questions are relevant in determining a prosecutor's constructive knowledge: "(1) whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control'; (2) the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources; and (3) whether the entity charged with constructive possession has 'ready access' to the evidence." *Risha*, 445 F.3d at 304.   Restated, the Third Circuit has "held that 'possession' in the *Brady* context extends to material not within the prosecutor's actual knowledge or possession, provided that the evidence is either (a) known to some other 'arm of the state,' or (b) 'known to others acting on the government's behalf in the case.'" *Strohl v. Grace*, 354 F. App'x 650, 654 (3d Cir. 2009) (quoting *Perdomo*, 929 F.2d at 971; *Reyeros*, 537 F.3d at 281).

In the matter *sub judice*, Defendants claim that the prosecution was in constructive possession of information known by the cooperating Highland partners, namely, Highland's financial records, as well as the County's financial records.  However, nothing in the record suggests that the Highland partners or County officials were acting on behalf of the prosecution, that these individuals were part of the investigative team, or that the Government had "ready access" to these financial records. *See, e.g., United States v. Salahuddin*, No. 10-104, 2012 WL 2952436, at *24 (D.N.J. July 19, 2012) (citing *Reyeros*,

537 F.3d at 282); *see also Pelullo*, 399 F.3d at 216 (a prosecutor is not obliged "to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue.").  Moreover, when information is in the possession of a third-party unrelated to the state, such as Highland, Third Circuit case law imposes no obligation on the prosecution to obtain and disclose such information. *See Strohl*, 354 F. App'x at 654 (citing *Perdomo*, 929 F.2d at 971) ("if the information is in the possession of a third-party unrelated to the state- as was true in this case, where the hospital reports were in the possession of Lehigh Valley Hospital Center- *Perdomo* imposes no such obligation."). And, in the context of an unrelated third-party, whether the prosecution could "readily have obtained the" evidence from that party is "immaterial" to the analysis. *See id*.

In addition, insofar as Defendants' submissions can be understood to suggest that a cooperating witness qualifies as a member of the "prosecution team" thus charging the Government with the knowledge the witness possesses, Defendants do not provide any support for this claim.  Courts that have considered this issue, however, have concluded that a cooperating witness is not, in fact, a member of the prosecution team. *See, e.g., United States v. Garcia*, 509 F. App'x 40, 42-43 (2d Cir. 2013) (noting that the Second Circuit "has never held that the 'prosecution team' includes cooperating witnesses"); *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) ("Graham argues that the Government exercised effective control over the evidence because Allen was a cooperating witness. Neither the case law nor the facts of this case support this argument."); *United States v. Meregildo*, 920 F. Supp. 2d 434, 444-45 (S.D.N.Y. 2013) (concluding that cooperating witness was not a member of the prosecution team); *Salahuddin*, 2012 WL 2952436, at *24 (rejecting the defendant's claim that the Government was charged with the knowledge of its cooperating witness and stating that the defendant failed to "offer any support that the Government can be charged with all knowledge possessed by a cooperating witness");

27

*United States v. Abdulwahab*, No. 10-248, 2011 WL 4434236, at *7 (E.D. Va. Sept. 22, 2011) ("The United States has no duty under *Brady* to investigate evidence that is under the control of a cooperating witness."); *United States v. Smith*, No. 08-31, 2011 WL 2416804, at *4 (E.D. Ky. June 13, 2011) ("the information in question was in the 'possession,' for lack of a better word, of its cooperating witness- not one of the prosecution's own agents.  For this reason, the Court is not persuaded that this is an instance where the United States willfully ignored information which it would otherwise have been required to disclose under *Brady* . . . ."); *United States v. McCall*, No. 00-0505, 2009 WL 4016616, at *1 (N.D. Cal. Nov. 18, 2009) (declining to extend the prosecutor's duty to learn of any favorable evidence known to police investigators and government agents to include cooperating witnesses); *cf. United States v. Cocchiola*, 358 F. App'x 376, 381 (3d Cir. 2009) ("the requirement that the Government disclose the material evidence in its possession is fundamentally different from placing an affirmative obligation on prosecutors to ferret out any potentially exculpatory evidence."); *United States v. Harry*, 927 F. Supp. 2d 1185, 1210 (D.N.M. 2013) ("A prosecutor does not have a duty to obtain evidence from third parties."); *United States v. Lujan*, 530 F. Supp. 2d 1224, 1231 (D.N.M. 2008) ("neither does the government have an affirmative duty under *Brady* to seek out information that is not in its or its agents' possession.").

For example, in *United States v. Graham*, the criminal defendants argued on appeal that the failure of the Government's cooperating witness to produce fifteen boxes of evidence until late in the trial constituted a violation of *Brady*. *See Graham*, 484 F.3d at 414. The cooperating witness was an unindicted co-conspirator who cooperated under the terms of a plea agreement. *See id*.  The Sixth Circuit held that the defendants failed to satisfy the suppression prong of *Brady* because they did not show "any withholding of evidence within the control of the Government." *Id*. at 417.  Rather, the fifteen boxes of evidence were in

the control of the cooperating witness, and the Sixth Circuit held that the knowledge of the cooperating witness could not be imputed to the prosecutor because unlike other agents considered part of the "prosecution team," "cooperating witnesses . . . stand in a very different position." *Id*.  The Court of Appeals reasoned that while a prosecutor has means to "discharge the government's *Brady* responsibility if he will," "[t]hat is not necessarily the case with regard to cooperating witnesses." *Id*.

Accordingly, in view of this authority, Defendants fail to demonstrate that the Government was in actual or constructive possession of the County and/or Highland financial records.   As such, Defendants fail to satisfy their burden under *Brady* of demonstrating the suppression of evidence by the prosecution.  Defendants, therefore, are not entitled to a new trial based on the claim that the Government suppressed the County and/or Highland's financial records.  And, because the evidence upon which Defendants base their *Brady* claim was not suppressed by the Government, I need not address whether this evidence was material under *Brady*.

Cordaro also argues that the Government violated *Brady* by suppressing information regarding a criminal investigation of McLaine and the ongoing bank fraud of Hughes. According to Cordaro, "[a] grand jury of Northampton County was investigating McLaine at the time of [his] trial[, and] the government not only knew about this criminal interest in P.J. McLaine, on Movant Cordaro's information and belief, the government sought and successfully put that investigation on hold to safeguard the planned testimony of one of its immunized star witnesses." (Doc. 339, 16.)   As to Hughes, Cordaro claims that the Government failed to disclose evidence of Hughes' fraudulent banking activity, and this evidence "would have shown that the lack of correlation between money Al Hughes received and alleged to have delivered to Cordaro was because Al Hughes was lying about facts central to the government's charges against Cordaro." (*Id*. at 21.)

Cordaro's request for a new trial under *Brady* based on the alleged suppression of the investigation of McLaine and the bank fraud of Hughes will be denied.  Cordaro has not supplied any evidence that an investigation of McLaine was underway at the time of his trial, nor has he provided evidence that the Government had contact with Northampton County officials to put the investigation of McLaine on hold until after Cordaro's trial.  Cordaro similarly fails to provide any evidence that the Government was aware of Hughes' alleged fraudulent banking activities prior to Cordaro's trial.  Cordaro's *Brady* claims relating to McLaine and Hughes are not based on facts or evidence.  Instead, they are grounded entirely on speculation.  But, the Third Circuit has cautioned that it is "unwise to infer the existence of *Brady* material based upon speculation alone." *United States v. Ramos*, 27 F.3d 65, 71 (3d Cir. 1994); *Maynard v. Gov't of Virgin Islands*, 392 F. App'x 105, 117 (3d Cir. 2010) ("the defendant may not rest his [*Brady*] claim on pure conjecture"); *see also United States v. Horton*, - - - F.3d - - -, 2014 WL 1140196, at *3 (8th Cir. Mar. 24, 2014) ("mere speculation is not sufficient to sustain a *Brady* claim."); *United States v. Jumah*, 599 F.3d 799, 809 (7th Cir. 2010) ("a defendant cannot demand a new trial based on mere speculation or unsupported assertions that the government suppressed evidence.").  Thus, as Cordaro offers nothing but speculation that the Government suppressed information relating to McLaine and Hughes, he has not demonstrated that the Government committed a *Brady* violation.  Cordaro's motion for a new trial based on these claims will be denied.

### III. Conclusion

For the above stated reasons, Cordaro's motion for leave to conduct discovery, Munchak's motion for new trial, and Cordaro's motion for new trial will all be denied.

An appropriate order follows.

July 17, 2014
Date

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge