**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,

v.

ROBERT C. CORDARO,

Defendant.

NO. 3:CR-10-75

(JUDGE CAPUTO)

## MEMORANDUM

Presently before me is Robert C. Cordaro's ("Cordaro") Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (Doc. 321.) Cordaro was charged with multiple offenses relating to allegations that he demanded payments from contractors and firms who had or wished to receive contracts with Lackawanna County during the time he served as an elected county commissioner. Cordaro proceeded to trial and was found guilty of 18 counts and not guilty of 15 counts charged in the Second Superceding Indictment.   He was sentenced to 132 months imprisonment.  The Third Circuit affirmed Cordaro's conviction and sentence on appeal.

Now, Cordaro seeks a new trial pursuant to 28 U.S.C. § 2255 on the basis that his counsel rendered ineffective assistance prior to and at the time of trial.  Cordaro claims that his counsel was ineffective for: (A) failing to properly prepare him to testify at trial; (B) conducting an abbreviated direct examination of him when he was on the witness stand; (C) failing to object to questions of whether other witnesses were lying; (D) failing to investigate the case; (E) failing to call a number of witnesses at trial; and (F) presenting inconsistent theories regarding the testimony of a crucial prosecution witness.  Cordaro argues that as a result of counsel's failings, either individually or cumulatively, there is a reasonable probability that, but for those errors, the result of his trial would have been different. Because he fails to satisfy the standard for evaluating ineffective assistance of counsel claims set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), Cordaro's § 2255 motion will be denied.

## I. Background

### A.    Relevant Factual Background

Cordaro was indicted on March 16, 2010 for conduct relating to his position as a Lackawanna County commissioner. (Doc. 1.)  A federal grand jury returned a superseding indictment on October 5, 2010. (Doc. 47.)   Subsequently, the Second Superseding Indictment was returned against Cordaro on March 29, 2011. (Doc. 94.)   Cordaro proceeded to trial in June 2011 on the Second Superseding Indictment.

At trial, numerous witnesses testified concerning illegal payments made to Cordaro. For example, Al Hughes ("Hughes") testified that he was the conduit of bribes from Acker Associates (P.J. McLaine), a firm that was doing substantial business with Lackawanna County, to Cordaro.  These payments to Cordaro were said to be $10,000 per month and totaled $365,000.  Hughes received Form 1099s from Acker Associates for many if not all of the alleged payments.  There was no evidence or suggestion that Hughes, a funeral director, was performing any services for Acker Associates.  It was uncontested that all Hughes did for Acker was to act as a conduit for the bribes.  There were also recordings of telephone conversations between Hughes and Cordaro referencing Hughes' complaints that Acker Associates had given him 1099s and that payments to him were subject to tax.

Don Kalina of Highland Associates testified that he gave Cordaro $30,000 when no one was present at Highland's offices except Cordaro and Kalina.

Michael Pasonick, an engineer who had contracts with Lackawanna County, testified he made two cash payments of $1,000 each to Cordaro.  The first payment was made on December 29, 2003, and the second payment was made on March 17, 2004.  There was an appointment with Pasonick on March 17, 2004 noted in Cordaro's calendar.

There was also testimony that Hughes brought Cordaro into a cell tower project at the suggestion of Acker Associates.  When the tower was sold, Cordaro, who was not

named as a partner, received $14,000.

Marc Boriosi testified that he made a cash payment of $2,000 to Cordaro. Boriosi and his partner, Charles Costanzo, replaced Joseph Ferrario's firm as the processors of workers compensation claims for Lackawanna County. Boriosi also testified to taking Cordaro on trips to New York City and Los Angeles.

The foregoing are most of the significant claims of wrongdoing by Cordaro that were presented to the jury.

At the conclusion of the trial, Cordaro was convicted of conspiracy to commit theft or bribery in violation of Title 18, United States Code, Section 371 (Count 13); bribery in violation of Title 18, United States Code, Section 666(a)(1)(B) (Counts 17-18); conspiracy to commit extortion under color of official right in violation of Title 18, United States Code Section 1951(a) (Count 19); extortion under color of official right in violation of Title 18, United States Code, Section 1951 (Counts 20-21); conspiracy to commit money laundering in violation of Title 18, United States Code Sections 1956(a)(1)(B)(I) and 1957 (Count 25); money laundering in violation of Title 18, United States Code Section 1956(A)(1)(B)(I) (Counts 26-28); racketeering in violation of Title 18, United States Code Section 1962© (Count 31); conspiracy to commit racketeering in violation of Title 18, United States Code Section 1962(d) (Count 32); conspiracy to defraud the United States in violation of Title 18, United States Code Section 371 (Count 33); subscribing and filing materially false tax returns in violation of Title 26, United States Code, Section 7206(1) (Counts 34-36); and income tax evasion in violation of Title 26, United States Code, Section 7201 (Counts 38-39). Conversely, Cordaro was found not guilty of Counts 1-12, 29-30, and 41.

A Judgment was entered against Cordaro on February 13, 2012. (Doc. 267.) Cordaro was sentenced to a term of imprisonment of 132 months.

Cordaro then appealed to the United States Court of Appeals for the Third Circuit.

*See United States v. Munchak*, 527 F. App'x 191 (3d Cir. 2013). The Third Circuit affirmed Cordaro's conviction and sentence on May 31, 2013. *See id.* at 193-95.[1] The Third Circuit issued a certified copy of its Judgment in lieu of a formal mandate on July 8, 2013. (Doc. 298.)

On November 21, 2013, Cordaro, *pro se*, filed the instant motion pursuant to 28 U.S.C. § 2255. (Doc. 321.)[2] The Government filed a brief in opposition to Cordaro's § 2255 motion on January 9, 2014. (Doc. 329.) Cordaro filed his *pro se* reply brief in further support of his motion on February 12, 2014. (Doc. 337.)[3]

By Order dated August 26, 2014 (Doc. 397), an evidentiary hearing was scheduled on Cordaro's § 2255 motion. Cordaro was appointed counsel the following day. (Doc. 398.) The proceedings on Cordaro's § 2255 motion were then stayed after Cordaro filed an appeal of the denial of his motion for new trial. (Docs. 399; 416.) After Cordaro's motion to lift the stay was denied (Doc. 427), he withdrew his appeal. (Doc. 430.) The evidentiary hearing on Cordaro's § 2255 motion was then rescheduled for January 26, 2015.

## B.    The Evidentiary Hearing

A three-day evidentiary hearing on Cordaro's § 2255 motion was held beginning on

---

[1]    The Third Circuit did, however, remand for a calculation of the proper amount of restitution to be imposed against Cordaro on Count 33 of the Second Superseding Indictment. *See Munchak*, 527 F. App'x at 196-98.

[2]    In his supporting brief, Cordaro raised the following arguments: (1) "Trial counsel was ineffective for failing to object to the Government's repeated and deliberate inappropriate questioning of Petitioner as to whether government witnesses had lied in order to convict him;" (2) "Counsel was ineffective for failing to investigate the financial records of the Petitioner and the Government cooperating witnesses;" and (3) "Counsel was ineffective for failing to interview, properly investigate, call defense witnesses, and other factual infractures." (Doc. 322.)

[3]    On February 24, 2014, Cordaro filed a motion for new trial pursuant to Federal Rule of Criminal Procedure 33. (Doc. 338.) That motion was denied on July 17, 2014. (Doc. 383.)

4

January 26, 2015.  Four witnesses testified at the hearing: Cordaro; William Costopoulos; Jerry Alan Johnson; and Anthony M. Cardinale.  Their testimony relevant to Cordaro's ineffective assistance of counsel claims is set forth below.

### 1.    William Costopoulos

William Costopoulos ("Costopoulos") was the first witness to testify at the evidentiary hearing. (Doc. 472, "*Costopoulos Test.*," 8:5-190:12.)  Costopoulos was Cordaro's lead trial counsel, and he was retained by Cordaro approximately two months before his arraignment. (*Id*. at 8:14-21.)  Prior to Costopoulos' participation in the case, Cordaro had retained Mike Schwartz ("Schwartz"), an attorney from Philadelphia. (*Id*. at 90:24-91:5.)

Around the time Cordaro was arraigned in March 2010, Costopoulos retained Jerry Alan Johnson to assist in the case. (*Id*. at 8:22-9:9.)  Both Costopoulos and Jerry Alan Johnson served as Cordaro's trial counsel in June 2011. (*Id*. at 9:10-12.)

Costopoulos recalled that at trial Cordaro was questioned by the prosecution some eleven different times about whether government witnesses were lying. (*Id*. at 14:24-15:3.) Costopoulos "intentionally" did not object to any of these questions. (*Id*. at 16:23-17:7.) Similarly, Costopoulos did not object to the prosecutor's statement in closing argument to the effect that "everybody is lying" except Cordaro, or the prosecutor's comment in rebuttal that "everybody is lying but me is just not a reasonable scenario." (*Id*. at 18:21-19:1; 19:8-12.)  Although at the time of trial Costopoulos had not read the Third Circuit's decision in *United States v. Harris*, 471 F.3d 507 (3d Cir. 2006) (*id*. at 14:20-23; 17:13-19; 19:5-7), he testified that he was aware, "with or without *Harris*," that questions about whether other witnesses are lying are objectionable. (*Id*. at 20:2-3; 22:5-7.)  Costopoulos explained that the reasons such questions are improper is because a witness is not to invade the province of the jury. (*Id*. at 22:13-17.)  In Cordaro's case, though, Costopoulos thought it was wise not to object to these questions because he believed allowing him to answer those

questions helped his defense. (*Id*. at 23:10-21.)  Costopoulos explained:

> I intentionally did not object to those questions to Bob Cordaro because his answer to those questions was what our defense was all about, and I was not going to object to my own defense. . . . Those questions opened the door for Bob to testify to what our defense was all about and those witnesses were lying.

(*Id*. at 20:3-12.)   The decision not to object, according to Costopoulos, was a tactical decision made using his best professional judgment. (*Id*. at 117:11-21.)

Costopoulos was also questioned at the evidentiary hearing about his decision to conduct an abbreviated direct examination of Cordaro at trial.   At trial, Costopoulos conducted a direct examination of Cordaro that lasted only a few minutes consisting of minor biographical information before he was turned over for cross examination. (*Id*. at 28:17-19.)   In his 43 years as a defense lawyer, Costopoulos had never utilized or witnessed an attorney conduct such an examination. (*Id*. at 24:4-9.)  Costopoulos testified that he lost sleep the night before Cordaro was to testify, and he decided to go in a different direction. (*Id*. at 25:7-9.)  Costopoulos discussed this tactic with Cordaro for approximately thirty minutes at breakfast on the morning he was to testify. (*Id*. at 24:21-25:5; 25:22-26:1.) Costopoulos recommended this approach, and Cordaro agreed and listened to Costopoulos' suggestion. (*Id*. at 26:19-23; 27:10-11.)   Costopoulos also discussed the abbreviated direct examination with Jerry Alan Johnson that morning, and he stated that Johnson "loved it." (*Id*. at 117:-118:5.)  Costopoulos testified that he was unable to decide how to conduct Cordaro's examination before trial because it depended on how the Government's case came in and whether it was strong or fell apart. (*Id*. at 116:4-16.)

Costopoulos described his reasoning for conducting an abbreviated direct examination: "the ultimate objective was for Bob to be able to tell his side to his jury in the most effective way possible, and I came up with this strategy to do it my way." (*Id*. at 28:1-4.) He explained that in utilizing this strategy he was taking two gambles.  The first gamble

was that the prosecution would not pass up the opportunity to cross examine Cordaro. Costopoulos indicated that there "was a lot [Cordaro] wanted to say that was continually unresponsive to any direct examination question I would have asked him." (*Id*. at 30:4-6.) Costopoulos, however, believed that the Government would cross examine Cordaro, and that "Bob Cordaro was going to answer every question he was prepared to answer and that he would be unresponsive to most of them." (*Id*. at 30:9-13.)   The second gamble, Costopoulos explained, was that I was going "to give Bob Cordaro his day in court" and "let Bob Cordaro say what he had to say whether it was responsive or unresponsive to the questions." (*Id*. at 30:14-19.)   Both gambles paid off, and Cordaro was able to present his story to the jury. (*Id*. at 30:22-24.)

By employing this strategy, Costopoulos stated that he was able to "reverse[ ] the order of the story telling," and conduct a redirect examination that went far beyond what he could have done on direct. (*Id*. at 31:2-16.)   In Costopoulos' opinion, "Bob Cordaro told his side of the story in the most efficient and effective and articulate way possible, and I thought he did fine." (*Id*. at 31:14-16.)

At the evidentiary hearing, Costopoulos was also questioned about his preparation of Cordaro prior to trial.   Costopoulos did not conduct any mock direct examination of Cordaro before trial. (*Id*. at 34:7-35:20.)   While he did not conduct a mock cross examination, Costopoulos testified that he cross examined Cordaro for a year and a half, and he estimated that they discussed the case together for forty hours. (*Id*. at 36:19-25; 100:17-18.)   Costopoulos also had Jerry Alan Johnson conduct a mock cross examination of Cordaro approximately a year before trial. (*Id*. at 37:1-38:20.)   Costopoulos could not recall how long the mock examination lasted. (*Id*.)   In view of that mock examination, Costopoulos told Cordaro that his impression was that there was no way he could win the case. (*Id*. at 40:2-41:24.)

Next, Costopoulos was questioned at the evidentiary hearing about his investigation of Cordaro's case prior to trial.  After being retained by Cordaro, Costopoulos discussed the case with Schwartz, Cordaro's initial counsel. (*Id*. at 92:12-16.)  Costopoulos also obtained and reviewed interview reports prepared by investigator Gregory Auld ("Auld") regarding his interviews of Anthony Munchak, Sal Cognetti, Glen Gress, Al Hughes, Don Kalina, Al Magnotta, John Meehan, Steve Tapone, and Jill Sensi. (*Id*. at 92:23-93:13.)  Costopoulos believed that Auld was retained by Cordaro directly through Schwartz. (*Id*. at 97:19-25.)  Costopoulos also discussed the case with Anthony Munchak's counsel, as well attorneys that represented some of the cooperating witnesses. (*Id*. at 100:19-101:25.)

Costopoulos received a voluminous amount of discovery from the Government on May 3, 2010. (*Id*. at 45:17-46:13.)   The discovery and other information provided to Costopoulos included interview reports, recorded conversations, proposed Government exhibits in the case, and immunity agreements. (*Id*. at 107:1-111:5.)  The Government also had pallets of boxes available for review by the defense. (*Id*. at 46:14-21.)   Neither Costopoulos nor Jerry Alan Johnson reviewed the documents in those boxes. (*Id*. at 46:22-47:4.)  Instead, the contents of those boxes were reviewed by Cordaro himself. (*Id*. at 49:3-13; 50:16-20.)  Regarding Hughes' bank records in those boxes, Costopoulos stated that he never looked at them because he "had the financial records of Al Hughes that mattered to me." (*Id*. at 47:13-16.)

Cordaro also repeatedly requested Costopoulos to subpoena records before trial. (*Id*. at 53:1-4.)  Costopoulos did not subpoena any documents prior to or during trial. (*Id*. at 51:5-7; 54:1-55:9.)  Costopoulos emphasized that "I did not subpoena those documents because I did not believe then or now that there would be anything in those documents that would be helpful in light of the documents I did have." (*Id*. at 55:6-9.)

Cordaro also requested Costopoulos to call certain witnesses at trial.  For instance,

Costopoulos, despite Cordaro's requests, refused to call Michael Kohanski ("Kohanski"), a Certified Public Accountant. (*Id*. at 57:19-24.) Kohanski prepared three iterations of a chart entitled "Robert Cordaro Schedule of Income and Deposits."  Costopoulos testified that he "didn't give any of Bob's documents to Kohanski," and that Cordaro was "dealing with his own accountant" with regard to the information contained in those charts. (*Id*. at 144:13-15.) Those charts purport to reflect the amount of cash available to Cordaro from years 2004 through 2007 by taking the sum reported on his tax return and subtracting the sum he deposited in two bank accounts.  Those charts, also for years 2004 through 2007, depict the number of county paychecks Cordaro both deposited and cashed, to again show the excess money available to Cordaro beyond funds that were deposited into his bank accounts.

The first version of the Kohanski chart also included "Additional Income Reported on 2006 Amended Tax Return" in an amount of $79,000. (Gov't Hr'g Ex. 28.)  That version of the chart reflected a total of $744,566 in cash available to Cordaro in years 2004, 2005, 2006, and 2007. (*Id*.)

The second iteration of Kohanski's chart is the same as the first, except it omitted the $79,000 in additional income reported on Cordaro's 2006 amended tax return.  (Cordaro Hr'g Ex. 2.)  According to the second iteration of the chart, $665,566 in cash was available to Cordaro from 2004 through 2007. (*Id*.)  Both the first and second versions of the chart incorrectly stated that Cordaro cashed the majority of his county paychecks when they were actually deposited.  Cordaro testified about the second version of the chart during trial.

After Cordaro testified, Kohanski prepared a third version of the chart, which stated that Cordaro deposited a number of county paychecks that the prior two iterations stated had been cashed. (Cordaro Hr'g Ex. 1.)  The third version also, for the first time, included $135,000 of "Cash reported by Robert Cordaro on Finance Report." (*Id*.)  In total, the final

chart prepared by Kohanski stated that Cordaro had $720,140 in excess cash available to him for years 2004 through 2007. (*Id.*)[4]

Costopoulos, over Cordaro's objection (*Costopoulos Test.*, 59:4-6), refused to call Kohanski to testify. Costopoulos explained that he would have gotten "killed on cross examination" if he had called Kohanski to testify based on the charts he prepared regarding Cordaro's income and deposits. (*Id.* at 58:7-9.) Costopoulos similarly stated that had he called Kohanski to testify, the problems with the chart would have been exposed during cross examination. (*Id.* at 131:21-25.)

Costopoulos also did not call Gregory Auld ("Auld"), an investigator, to testify at trial despite Cordaro's request. (*Id.* at 69:23-70:3.) Cordaro wanted Costopoulos to call Auld to testify that Hughes, a key Government witness, had previously remarked that the investigation into Cordaro was a joke. (*Id.* at 72:18-22.) Costopoulos did not call Auld because he had the entirety of Auld's work product. (*Id.* at 73:2-4.) Likewise, Costopoulos did not call Tom Durkin, Paul Mazzoni, Jenine Ikeler, Robert Bamford, Anthony Lomma, or Cordaro's wife or father. (*Id.* at 75:13-21; 76:8-77:13; 119:23-120:13; 121:11-122:13; 159:24-161:9.) Costopoulos explained that he did not call these witnesses over Cordaro's objections for a variety reasons, such as Cordaro's prior request that his family not be involved in the case, and that these witnesses did not have relevant testimony to offer. Additionally, although Cordaro wanted different county workers and vendors to testify that he never asked them to do anything inappropriate, Costopoulos believed this testimony was never going to come in and was in fact ruled inadmissible. (*Id.* at 76:8-20; 123:19-124:10.)

---

[4]     The number of county paychecks deposited and cashed by Cordaro from 2004 through 2007, as reflected in the third version of Kohanski's chart, still differed from the evidence presented by the Government at trial. (*Trial Tr.*, 6/17/2011, 130:5-131:24.)

### 2.      Jerry Alan Johnson

The second witness to testify at the evidentiary hearing was Jerry Alan Johnson ("Johnson"), who sat "second seat" at Cordaro's trial. (Doc. 473, "*Johnson Test.*," 5:13-14.) Although he had a more limited role in the case than Costopoulos, Johnson was responsible for the cross examination of two significant witnesses, Hughes and P.J. McLaine ("McLaine"). (*Id*. at 8:4-9.)  Johnson also gave Cordaro's opening statement. (*Id*. at 8:10-11.)

Johnson testified that while he would normally conduct a mock direct examination of his witnesses, especially if the witness was the defendant, he did not with Cordaro, but Cordaro was not his witness in the case. (*Id*. at 18:11-21.)  Johnson did conduct a brief mock cross examination of Cordaro, and he recalled that mock examination lasted only about ten minutes. (*Id*. at 19:8-17.)  Johnson did not remember doing a follow-up mock cross examination after that time. (*Id*. at 20:12-14.)

Johnson did not personally serve any subpoenas for documents in the case, and he was unaware whether Costopoulos did so either. (*Id*. at 25:21-26:4.)  He also did not go review the boxes of documents at the U.S. Attorney's Office. (*Id*. at 33:13-23.)

Prior to cross examining Hughes, Johnson did not recall making any independent efforts to obtain or review Hughes' financial records. (*Id*. at 56:15-21.)  He also did not cross examine Hughes about two checks Cordaro received from Hughes which Cordaro claimed were the proceeds of lost bets. (*Id*. at 51:5-55:17.)  Johnson could not recall whether Cordaro asked him to question Hughes about these purported bets, but Johnson explained that even if Cordaro did request him to examine Hughes on this topic he would not have done so because such questions would have distracted the jury from the defense theory that Hughes kept the entire $365,000 for himself. (*Id*. at 52:17-24; 101:16-24.)

### 3.   Anthony M. Cardinale

The third witness to testify at the evidentiary hearing was Anthony M. Cardinale ("Cardinale"), an attorney with thirty-eight years experience practicing criminal law. (Doc. 473, "*Cardinale Test.*," 129:16-25.)  Cardinale was called by Cordaro to render an expert opinion on the performance of trial counsel in this case.   The Government objected to Cardinale offering such testimony on the basis that his opinion was "simply subjective, conclusory approach that cannot be reasonably assessed for reliability and is not admissible under Rule 702 or *Daubert*." (*Id*. at 173:8-10.)  While I allowed Cardinale to testify, I noted that I would determine "whether or not it's entitled to a given amount of weight depending on the factors that you raised in the *Daubert* objection as well as any other factors that are presented to me both on direct and cross examination." (*Id*. at 174:13-19.)[5]

Cardinale testified that he has issued Rule 17(c) subpoenas before and has found them to be extremely helpful and that he would not rely solely on the Government's discovery in any case. (*Id*. at 174:24-176:21.)  Cardinale also testified that is important to attempt to talk with government witnesses in every case. (*Id*. at 183:16-185:9.)  He also stated that in a case involving a significant amount of financial documents he would retain the assistance of an expert to test the Government's case. (*Id*. at 185:10-22.)

With respect to having a criminal defendant testify in his own defense, Cardinale testified that, in his view, "the most crucial decision in a federal criminal trial is whether a defendant is going to testify or not" because "[i]t comes down to a - - a simple they believe

---

[5]    Here, I conclude that the testimony provided by Cardinale lacks any probative value because I have the "ability to 'assess' the issues'" raised in Cordaro's § 2255 motion. *Earp v. Cullen*, 623 F.3d 1065, 1075 (9th Cir. 2010) ("Expert testimony is not necessary to determine claims of ineffective assistance of counsel."); *see also Heishman v. Ayers*, 621 F.3d 1030, 1041 (9th Cir. 2010) ("A federal court may determine that it does not require expert assistance to understand the legal analysis required by *Strickland*.").  Thus, only a brief summary of the substance of Cardinale's testimony is set forth in the text.

the defendant or they don't believe him.  Everything else you've done including whatever legal issues you might establish literally go out the window and becomes a straight simple case of credibility." (*Id*. at 185:25-186:17.)  To prepare a defendant to testify, Cardinale explained that he would make sure the defendant was fully familiar with the facts of the case and the elements of every charge. (*Id*. at 186:18-187:7.)  He would also conduct mock direct and cross examinations of a witness. (*Id*. at 187:8-189:15.)  Cardinale also stated that he has never turned over a criminal defendant for cross examination after asking only a few biographical questions. (*Id*. at 189:16-190:12.)

Cardinale further testified that attorneys have an obligation to object to any question they view as improper. (*Id*. at 190:13-16.)  He further stated that questions by the prosecutor of whether other witnesses are lying should be objected to because they are improper, especially when the questions focus on the veracity of agents of the federal government. (*Id*. at 190:21-191:17.)

Based on his review of the materials in the case, Cardinale opined that Cordaro's trial counsel "did not meet the standards that would be prevalent and used in the normal course in federal criminal trials." (*Id*. at 193:12-15.)  Specifically, Cardinale identified the failure to review certain financial records, the use of the abbreviated direct examination, and the failure to issue Rule 17 subpoenas, as well as the cumulative effect of these individual errors, as sufficient reasons to call into question the reliability of the verdict. (*Id*. at 194:12-197:2.)

### 4.    Robert Cordaro

Cordaro was the final witness to testify at the evidentiary hearing.  He retained Costopoulos in January 2010, and Johnson was brought in the case by Costopoulos in March 2010. (Doc. 474, "*Cordaro Test.*," 8:2-24.)  Neither Costopoulos nor Johnson ever conducted a mock direct examination of him, and he denied that a mock cross examination

was ever conducted by Johnson. (*Id*. at 9:10-10:1.)  Instead, Cordaro testified that Johnson asked him questions for ten minutes on one occasion about his finances. (*Id*. at 10:2-12.) Cordaro stated that during that conversation he was unable to answer some questions about what his finances would show, and he directed Costopoulos to contact Rick Zayas ("Zayas"), a forensic accountant. (*Id*. at 10:13-20.)  Although Zayas was paid, Cordaro's counsel never spoke to him, a fact which Cordaro did not learn until trial or the eve of trial. (*Id*. at 11:1- 12:1.)[6]  Because Costopoulos had not spoken with Zayas at that point, Cordaro then suggested that they use his accountant, Kohanski, at trial. (*Id*. at 12:10-22.) Additionally, Costopoulos nor Johnson ever reviewed with Cordaro his bank records or tax returns prior to trial. (*Id*. at 14:20-15:5.)

Cordaro learned shortly after he was indicted that the Government made available boxes of documents for review. (*Id*. at 31:4-13.)  Cordaro believed that they would be reviewed by his attorneys or an investigator. (*Id*. at 31:14-17.)  In March 2011, Cordaro learned that these materials had not been reviewed, and although he encouraged Costopoulos to go look at these records, Costopoulos never responded to that request. (*Id*. at 31:18-32:5.) Shortly before trial, after Costopoulos failed to respond to Cordaro's request that he review these documents, Cordaro decided to go look at those documents at the F.B.I. office in Scranton with Chris Powell, Anthony Munchak's attorney. (*Id*. at 32:22-33:11.)  Cordaro subsequently emailed Costopoulos identifying documents he believed were important for trial. (*Id*. at 34:21-35:10.)  During the course of trial, Cordaro also suggested questions that his attorneys should ask different witnesses. (*Id*. at 91:21-24.)

As trial approached, and during the course of his trial, Cordaro testified that he did not do extensive preparation with his attorneys. (*Id*. at 35:19-36:6.)  On the evenings after

---

[6]     Neither Costopoulos nor Johnson knew who Zayas was when asked at the evidentiary hearing. (*Costopoulos Test.*, 77:23-78:13; *Johnson Test.*, 35:10-13.)

court adjourned for the day, Cordaro testified that his attorneys did not prepare him or any other witnesses to testify. (*Id*. at 36:15-17.)  Cordaro stated that he became concerned during the course of trial that witnesses were not being prepared to testify on his behalf. (*Id*. at 37:15-22.)  These witnesses included Robert Bamford, Anthony Lomas, Paul Mazzoni, and Zayas. (*Id*. at 35:23-40:5.)  Because Zayas was not contacted prior to trial, Cordaro suggested that they call Kohanski. (*Id*. at 40:6-10.)  Kohanski prepared, at Cordaro's request, a report of Cordaro's finances during trial using government exhibits. (*Id*. at 40:11-41:15.)  The chart represented the cash available to Cordaro for years 2004 through 2007. (*Id*. at 82:4-9.)

As discussed, Kohanski prepared an initial report, (Gov't Hr'g Ex. 28), which was then modified to eliminate the $79,000 for "Additional Income Reported on 2006 Amended Tax Return." (Cordaro Hr'g Ex. 2.)  Cordaro relied on that report, (Cordaro Hr'g Ex. 2), when he testified at trial, but that document incorrectly reflected that he cashed almost all of his Lackawanna County paychecks in 2006 and 2007 when, in fact, those paychecks were deposited. *(Cordaro Test.*, 48:3-23.)[7]  As a result of that error, Kohanski created a final report. (Cordaro Hr'g Ex. 1.)  Cordaro then begged Costopoulos to have Kohanski testify, but Costopoulos refused to call him as a witness. (*Cordaro Test.*, 51:5-23.)  Cordaro explained that the chart was significant because it demonstrated that he had legitimate cash available to justify his spending which negated the Government's corroboration for the bribes. (*Id*. at 49:22-51:4.)  Costopoulos, according to Cordaro, failed to understand the chart. (*Id*. at 51:5-9.)

At breakfast the morning he was to take the witness stand, Cordaro testified that he

---

[7]     On cross examination, the Government presented a number of checks that Cordaro deposited that he had testified had been cashed. (*Trial Test.*, 6/16/2011, 91:5-97:3.)

was informed by Costopoulos that "he was going to try something," which Cordaro understood to mean that Costopoulos was not going to ask him any questions. (*Id*. at 52:2-20.) Cordaro trusted Costopoulos' judgment, but he was not informed that Costopoulos had never used that technique nor seen it performed in his career. (*Id*. at 53:2-20.)  Cordaro recalled that leaving breakfast he was "dazed" because it meant that Costopoulos was not ready to do his direct examination and that he was "the only chance we have to save this case." (*Id*. at 53:22-54:5.)[8]

## C.    Post-Evidentiary Hearing

On January 29, 2015, the day after the evidentiary hearing concluded, a telephonic conference was held with the parties.  Following that conference, an Order was issued (Doc. 466) setting forth a schedule for the submission of post-evidentiary hearing briefs. That Order provided that Cordaro had thirty days from the receipt of hearing transcripts to submit his brief, the Government had twenty-one days thereafter to file a brief in opposition, and Cordaro could, within ten days of receipt of the Government's brief, file a reply brief in further support of his motion. (*Id*.)  In addition, that Order provided that argument would be held on the § 2255 motion following the submission of the briefs. (*Id*.)  Ultimately, Cordaro filed his brief on April 9, 2015 (Doc. 478), the Government's brief in opposition was filed on May 14, 2015 (Doc. 485), and Cordaro's reply brief was filed on June 5, 2015 (Doc. 491). Argument on Cordaro's § 2255 motion was heard on June 18, 2015.

Since argument was heard on June 18, 2015, Cordaro filed three supplemental submissions without leave of court. (Docs. 497; 500; 503.)  In brief, the first supplemental submission is a letter from Cordaro providing "a quick summary of items and issues not covered in today's closing argument." (Doc. 497.)  The second submission is entitled "Memo

---

[8]     Cordaro also submitted a number of affidavits from various witnesses, including Kohanski, Auld, and Mazzoni, in support of his motion. (Docs. 457; 459.)

Re: Bank Records," which discusses the bank account records of Hughes. (Doc. 500.)  I subsequently ordered Cordaro to provide citations to the trial record by page of any testimony referred to in that submission. (Doc. 505.)  Cordaro timely complied with that Order. (Doc. 508.)   In his "Third and Final Supplemental Submission Following Oral Argument," Cordaro seeks to impeach the testimony provided by Costopoulos at the evidentiary hearing with other statements he made throughout the course of this case (which he was not questioned about at the evidentiary hearing).   (Doc. 503.)   The Government has moved to strike all three supplemental submissions on the basis that the filings fail to comply with the Court's Local Rules and that allowing Cordaro to reopen the record at this time would prejudice the Government. (Docs. 498; 506.)

## II. Legal Standard

"Motions pursuant to 28 U.S.C. § 2255 are the presumptive means by which federal prisoners can challenge their convictions or sentences that are allegedly in violation of the Constitution." *Okereke v. United States*, 307 F.3d 117, 120 (3d Cir. 2002). Section 2255 permits a prisoner sentenced by a federal court to move the court that imposed the sentence to "vacate, set aside, or correct the sentence" where: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose such sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255(a).

Here, Cordaro contends that he is entitled to a new trial based on the alleged deprivation of his Sixth Amendment right to the effective assistance of counsel.  Among other protections, the Sixth Amendment guarantees an accused in a criminal prosecution "to have the assistance of counsel for his defense." U.S. Const. amend. VI.  The applicable federal precedent for ineffective assistance claims is the well-settled two-prong test

17

established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

To establish he was denied the effective assistance of counsel under *Strickland*, the movant must show that (1) the performance of trial counsel fell below an objective standard of reasonableness, and (2) the performance of counsel unfairly prejudiced the defense. *Id.* at 687-88, 691, 104 S. Ct. 2052. "Both *Strickland* prongs must be satisfied." *George v. Sively*, 254 F.3d 438, 443 (3d Cir. 2001) (citing *United States v. Nino*, 878 F.2d 101, 104 (3d Cir. 1989)).

The first *Strickland* prong requires a defendant to "establish . . . that counsel's performance was deficient." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001). Proving a deficiency in conduct "'requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed defendant by the Sixth Amendment.'" *Id*. (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052). "In assessing counsel's performance, 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Id*. (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052).

"Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is to say, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. The benchmark for judging any claim of ineffectiveness of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*.

The second prong of *Strickland* requires a defendant to show that counsel's performance unfairly prejudiced the defendant, meaning that counsel's errors were so serious as to deprive the defendant of a trial whose result is reliable. *Id*. at 687, 104 S. Ct. 2052.  It is not enough to show that the error had some conceivable effect on the outcome of the proceeding, for virtually every act or omission would meet such a test. *Id*. at 693, 104 S. Ct. 2052.  Rather, the defendant must show there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id*. at 694, 104 S. Ct. 2052.  A reasonable probability is sufficient to undermine confidence in the outcome of the trial. *Id*.  The Third Circuit has stated that the "*Strickland* prejudice standard is not 'stringent'- it is, in fact, 'less demanding than the preponderance standard.'" *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011) (quoting *Jermyn*, 266 F.3d at 282).

### III. Discussion

Cordaro contends that his defense counsel was ineffective in the following respects: (A) failing to properly prepare him to testify; (B) conducting an abbreviated direct examination; (C) failing to object to improper questioning; (D) failing to investigate the case; (E) failing to call a number of witnesses at trial; and (F) presenting inconsistent theories regarding the testimony of Hughes.  Cordaro argues that these errors, either individually or cumulatively, caused him to suffer prejudice so as to warrant a new trial.

The resolution of the question of whether Cordaro's counsel was ineffective takes into account the issue of prejudice, which is whether, but for any professional errors of counsel, the result would have been different.  In assessing prejudice, "[i]t is firmly established that a court must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied." *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999).  Unless the strength of the case is considered a "court simply cannot" "determine whether there is a reasonable probability that, but for counsel's errors, the result of the trial

would have been different." *Id*. (citations omitted).  As such, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696, 104 S. Ct. 2052.

The strength of the Government's case against Cordaro has been commented on by both this Court and the Third Circuit. *See United States v. Cordaro*, No. 10-75, 2012 WL 3113933, at *6 (M.D. Pa. July 31, 2012) (noting that the Government presented "strong supporting evidence" of Cordaro's guilt at trial); *United States v. Munchak*, 527 F. App'x 191, 196 (3d Cir. 2013) (commenting on the "strength of the Government's case, including the number of witnesses who testified to giving illegal payments to Cordaro").  In addition to the strength of the Government's case and the number of witnesses that testified to giving Cordaro bribe payments, there are, in my view, three major hurdles to overcome the question of prejudice if it is assumed there were errors on the part of counsel, namely, (1) Cordaro's testimony that he cashed the majority of his county paychecks when he did not do so; (2) Cordaro's testimony that he was at a bar with Tim Earley on St. Patrick's Day in 2004, while his calendar noted a scheduled meeting with Michael Pasonick, who testified this is when a bribe was paid to Cordaro; and (3) no explanation of the payments by Acker Associates to Hughes that are consistent with innocence.

With respect to the county paychecks, Cordaro testified in support of his defense of dealing in cash and hence having legitimate, large cash reserves, that he cashed most of his paychecks from Lackawanna County for his salary as a commissioner during his tenure. It turned out that the reverse was the case, *i.e.*, most of his county paychecks were not cashed, but were deposited in one of his accounts.[9]  This was not only a blow to the

---

[9]  Cordaro blames counsel for this, saying that counsel did not review his financial records.  The logic of this contention is that counsel is ineffective if he/she does not verify everything that counsel is told by the defendant.

defense's theory of the case, but to the credibility of Cordaro as well.

Next, Cordaro's calendar as a commissioner noted a 3:30 p.m. appointment with Michael Pasonick on St. Patrick's Day (March 17, 2004). Cordaro had previously testified at trial that he was at McMullen's bar from the morning until between 4:30 and 6:00 in the evening with Tim Earley, and that he spent preceding St. Patrick's Days with Earley for the same or similar periods of time. Earley was called, and he corroborated Cordaro's testimony that they were together at McMullen's on March 17, 2004 from 11:30 a.m. until 5:00 p.m. He also testified that he did not make any political contributions to Cordaro prior to 2007, whereupon the prosecutor produced six of Earley's checks payable to Cordaro's campaign before 2007. Again, this was a blow to the defense of denial as well as to Cordaro's credibility.

Lastly, it was not disputed at trial that thousands of dollars were paid by Acker Associates (P.J. McLaine) to Hughes. Hughes and McLaine testified that these payments were for Cordaro, and that $10,000 was paid monthly to Cordaro and $365,000 was paid over three years.[10] Acker gave Form 1099s reflecting these payments to Hughes. McLaine testified that Hughes performed no services for Acker other than to be the conduit for the payment of bribes to Cordaro. Hughes complained to Cordaro about this because he had to report it as income and pay taxes thereon. (Gov't Trial Ex. 67.3.)[11]  In recorded conversations played at trial, Hughes complained to Cordaro that he was not going to take the blame for everyone, and Cordaro responded by screaming at Hughes to not talk about

---

[10]    Hughes testified that he paid Cordaro $125,000 in 2005, $120,000 in 2006, $110,000 in 2007, and $10,000 in 2008 on behalf of McLaine. (*Trial Tr.*, 6/8/2011, 127:179-129:1.)

[11]    The 1099s Hughes received from Acker Associates reported his income as $91,650 in 2005, $89,500 in 2006, $82,800 in 2007, and $29,140 in 2008. (*Trial Tr.*, 6/8/2011, 148:22-152:17.)

21

it over the phone. (Gov't Trial Exs. 67.4-67.5.)   None of this was helpful to Cordaro's defense.

Part of Cordaro's defense was that Hughes was a degenerate gambler who gambled large sums of money, and presumably gambled away the money given to him by Acker Associates.  This theory asks the jury to believe there was no scheme to bribe or kickback and therefore no money ever went to Cordaro.  The evidence in support of this theory was scant, at best.  On the other hand, there was evidence that allowed the jury to believe there was a scheme of bribes or kickbacks and some, if not all money paid by Acker to Hughes, did reach Cordaro.  Given that the testimony that Hughes did nothing for Acker except act as a conduit of bribes from Acker to Cordaro was uncontested, and that many of the payments are evidenced by 1099s issued by Acker, how likely is it that the jury would believe that Hughes never gave any of the money to Cordaro?

This set of circumstances, coupled with the strength of the other evidence against Cordaro, make it most unlikely that the result of the case would have been different.  And if you consider that the entire case was a battle for credibility, viz Cordaro versus the witnesses against him, the cumulative negative impact of these scenarios makes a verdict of not guilty not reasonably probable.  With these considerations in mind, I will now address Cordaro's claims individually before discussing his request for habeas relief based on the cumulative effect of his counsel's alleged errors.

A.      **Failure to Prepare**

Cordaro first asserts that his counsel failed to properly prepare him before he took the witness stand, namely, he was not properly prepared to testify on direct or cross examination.  Cordaro states in his post-evidentiary hearing memorandum that "having been given no idea what questions or tenor to expect from the government[ ] [he] became argumentative and combative with the prosecutor (contrary to his demeanor at the

evidentiary hearing) and this severely undermined his credibility with the jury." (Doc. 478, 24.)  Cordaro further emphasizes that counsel's preparation of him to testify was virtually non-existent because they did not conduct any mock direct examination before his testimony, and only a single, ten-minute mock cross examination. (Doc. 491, 3-4.)

Relief on Cordaro's failure to prepare claim is not warranted.  Although Costopoulos did not conduct any mock examinations and Johnson only performed a brief mock cross examination, Costopoulos testified that he cross examined Cordaro for a year and a half, and he estimated that they discussed the case together for forty hours.  Costopoulos also stated that Cordaro was totally prepared for the case and had been prepared since he got the case.  The evidence presented at the evidentiary hearing further reflects that Cordaro was deeply involved in all aspects of the case.  He reviewed documents in the possession of the Government (although he asserts this was done only because counsel failed to do so); he provided points for the cross examination by the defense of most, if not all, the crucial witnesses; and he provided the names of witnesses he wanted counsel to call to testify.  Moreover, Costopoulos decided after ten minutes of Johnson's practice cross examination of Cordaro that he could not win the case, and then he attempted to convince Cordaro to accept a plea.

I need not decide whether counsel's preparation of Cordaro was deficient because Cordaro was not prejudiced by any alleged failure in preparation.  As the trial transcript reflects, Cordaro knew the case and was able to deny all of the charges that were brought against him.  Besides identifying that his counsel failed to prepare him for the fact that his bank records showed that county paychecks were deposited and not cashed (as he testified at trial),[12] coupled with the lack of mock direct examinations and only a brief mock cross

---

[12]     Cordaro's claim that it was his counsel's failure to prepare him which caused him to testify that he cashed the majority of his county paychecks when they were

examination, Cordaro has not noted any other deficiencies in with which he was unprepared at trial.  Indeed, Cordaro did not testify that he was surprised by any question posed to him by the Government during the course of his testimony.

At trial Cordaro testified as confidentially as I have ever observed a witness.  He was sure of his answers and often attempted to point out flaws in the prosecutor's questions. His demeanor and answers on the witness stand did not reflect a failure to prepare him. If anything, the self assurance in some of his answers simply conflicted with other credible testimony.  Thus, Cordaro has not demonstrated that any alleged inadequate preparation prejudiced him at trial.

Moreover, Cordaro's claim of prejudice due to a lack of preparation needs to be assessed in view of the strength of the Government's case against him.  I previously noted in denying Cordaro's motion for bail pending appeal that the Government presented "strong supporting evidence" of his guilt at trial. *See United States*, 2012 WL 3113933, at *6.  In denying Cordaro's direct appeal, the Third Circuit likewise commented on the "strength of the Government's case, including the number of witnesses who testified to giving illegal payments to Cordaro, . . . ." *Munchak*, 527 F. App'x at 196.

Further, the idea that Cordaro was not prepared for his testimony overstates the complexity of the case.  This was a case where a given number of identified witnesses said they paid Cordaro bribes or kickbacks.  Cordaro knew of the expected testimony of each of these people and the circumstances under which they would testify the payments occurred.  His preparation was to know this, and since his defense was to deny it, to be prepared to do so.  This is exactly what he did.  While Cordaro was often unresponsive on

---

actually deposited defies logic.  Cordaro endorsed these checks, and the suggestion that he did not know he cashed them because his counsel failed to tell him rings hollow.

cross examination, he did get to tell his version of events, and this is precisely what Costopoulos' strategy was.  The stumbles that occurred in his testimony, viz that he did not cash the bulk of his county paychecks; that Earley was impeached by virtue of political contributions to Cordaro which Earley denied in his direct testimony; and the inability to explain payments Hughes said he transmitted from Acker, much less the recorded telephone conversations which were incriminating, all contributed to undermining Cordaro's denials.

This case was not complicated; the denials by Cordaro were overcome by the amount of evidence, and the inconsistencies and untenability of the explanations he gave. Cordaro is not entitled to habeas relief on his failure to prepare claim.

## B.    Abbreviated Direct Examination

Next, Cordaro contends that a new trial is warranted based on the prejudice he suffered as a result of his counsel's defective performance in conducting an abbreviated direct examination.  At trial, Costopoulos posed a limited number of background questions to Cordaro before asking: "Mr. Cordaro, are you willing and prepared to answer any and all questions the government may have regarding any witness, any document or allegation made in this courtroom?"  In response, Cordaro replied that "I am not sure how prepared I am. I am certainly willing. I am here." (*Trial Tr.*, 6/16/11, 34:9-13.)  Cordaro contends that this approach to direct examination was counter to prevailing professional norms and prejudicial.

The parties have not cited any authority, nor am I aware of any, holding that such a tactic constitutes deficient performance under *Strickland* as a matter of law.  While the abbreviated direct examination tactic is "unorthodox," it is "not unheard of," although "there is a clear reason why few defense attorneys decide to conduct their client's testimony in this manner- it is at best, objectively risky, and at worst, might under certain circumstances

25

constitute ineffective assistance." *Rayborn v. United States*, 489 F. App'x 871, 878 (6th Cir. 2012).  As such, a number of Courts of Appeals "have commented disapprovingly on the limited examination tactic." *Id*. at 878-79.  (citing *Arellano v. Borg*, 154 F. App'x 9, 10-11 (9th Cir. 2005); *Patrasso v. Nelson*, 121 F.3d 297, 302 (7th Cir. 1997); *Marino v. United States*, 600 F.2d 462, 463 (5th Cir.1979)).

Although use of the abbreviated direct examination tactic may generally "toe[ ] the line of professionally competent assistance," *Rayborn*, 489 F. App'x at 879, I do not believe that Costopoulos' performance was deficient in relying on this strategy in the context of this particular case.  Costopoulos stated that he relied on this approach because this was the best way for Cordaro to get his story out in the most efficient, effective, and articulate way possible.  Costopoulos testified that there was a lot of information Cordaro wanted to say that would be unresponsive to any direct examination question that he would have been asked.  Costopoulos further emphasized that Cordaro on cross examination would be unresponsive to most of the questions asked of him, but that I was "going to give Bob Cordaro his day in court" and "let Bob Cordaro say what he had to say whether it was responsive or unresponsive to the questions." (*Costopoulos Test.*, 30:14-19.) Costopoulos testified that Cordaro's testimony was spirited, and even though he argued with the prosecutor, Costopoulos believed that Cordaro "nailed" his testimony and got his story before the jury.  Costopoulos then explained that by employing this strategy he was able on redirect to "fill in the blanks to give some color and dimension to the story which Bob told" which went far beyond anything he "could have done on direct." (*Id*. at 31:2-9.)

While Costopoulos' decision to present his client's testimony in this manner was certainly unorthodox and may be ineffective in some cases, Cordaro has failed to rebut the presumption that his counsel's conduct was part of a sound trial strategy.  To rebut this "weak presumption," Cordaro must show "either that the conduct was not, in fact, part of a

strategy or by showing that the strategy employed was unsound." *Thomas v. Varner*, 428 F.3d 491, 499 (3d Cir. 2005) (citation and footnote omitted).

Here, the record reflects that the decision to conduct a limited direct examination of Cordaro was in fact a part of Costopoulos' strategy, namely, that Cordaro would be unresponsive to questions on direct examination and that he would be given significantly greater latitude to provide unresponsive answers on cross examination which would allow Cordaro to tell the story he wanted told at trial.  Costopoulos also explained that his strategy involved conducting a redirect examination, which he did, to fill in the blanks that went far beyond anything he could have done on direct examination.  Accordingly, use of the limited direct examination was part of Costopoulos' trial strategy.  That being the case, Cordaro, to rebut the weak presumption that this tactic was part of a sound trial strategy, must thus demonstrate that the strategy was actually unsound.  The strategy, while unusual, was not unsound in this case.  Cordaro, both at trial and at the evidentiary hearing, tended to provide answers that were frequently non-responsive to the question posed in order to tell his story.  In view of Cordaro's penchant to go on narratives and to testify in such a manner, I cannot say that Costopoulos' strategy to conduct a brief direct examination of Cordaro in order to allow him to best tell his story and have his day in court was unsound.  Cordaro has thus failed to overcome the presumption that his counsel's conduct was part of a sound trial strategy, and he has not demonstrated that his counsel's performance was objectively unreasonable.

Furthermore, even if counsel's conduct was unreasonable, Cordaro was not prejudiced by the abbreviated direct examination.  Cordaro was able to confront each of the allegations of wrong doing with testimony that the events did not occur (thus demonstrating that this indeed was a case about who was truthful).  Cordaro does not contend that he was unable to tell his version of the events at trial, and he has not identified any testimony that

27

would have been elicited by a typical direct examination that he did not otherwise testify to at trial.  Moreover Cordaro did not testify that he disapproved of the tactic.  Rather he seemed to embrace it.  When asked about it at the evidentiary hearing, his testimony suggesting being dazed was less than convincing.  Further Cordaro failed to demonstrate just what the preparation should have been and how it would have rendered his testimony, which essentially was to deny the adverse testimony of wrongdoing, more effective.  And, considering the strength of the Government's case against him, even if his counsel erred in conducting an abbreviated direct examination, Cordaro has not shown a reasonable probability that absent this error the result of the proceeding would have been different.

## C.   Failure to Object

Cordaro next claims that trial counsel was ineffective for failing to object some eleven times to the prosecutor asking him on cross examination whether a particular witness whose testimony was contrary to his was lying.  Cordaro contends that such questions are prohibited by *United States v. Harris*, 471 F.3d 507 (3d Cir. 2006).[13]

Context is relevant here.  When Cordaro was called as a witness at the commencement of his case, he was asked only a limited number of background questions before Costopoulos posed the following question: "Mr. Cordaro, are you willing and prepared to answer any and all questions the government may have regarding any witness,

---

[13]     In *Harris*, the Third Circuit held that "asking one witness whether another is lying is inappropriate." *Harris*, 471 F.3d at 511.  Yet, the *Harris* court noted that "such questions would obviously be proper if a defendant opened the door by testifying on direct that another witness was lying." *Id*. at 512.  The court also explained that "it is often necessary on cross-examination to focus a witness on the differences and similarities between his testimony and that of another witness.  This is permissible provided he is not asked to testify as to the veracity of the other witness." *Id*.  Lastly, the Third Circuit left open "the possibility that other circumstances may make a question about another witness' veracity appropriate." *Id*.

any document or allegation made in this courtroom?"  Cordaro replied that "I am not sure

how prepared I am.  I am certainly willing.  I am here."  Costopoulos then stated: "You may

cross examine." (*Trial Tr.*, 6/16/11, 34:9-14.)

    The trial record reflects the defense strategy that the witnesses against Cordaro were

untruthful.  This is in the content of counsel's opening to the jury,[14] is the sole focus of the

cross examinations of the witnesses who testified against Cordaro, and is a major theme

in counsel's closing argument.

    Moreover, prior to any question posed to Cordaro as to whether a particular witness

was lying, Cordaro, in denying he received illegal payments, testified it was "completely

untrue," and as to whether he extorted from would-be candidates for county business, he

testified "for whatever things [those candidates] did that you had on them gave them

immunity to come in here and tell this story that you wanted told, not the truth."[15]  These

---

[14]     Johnson's comments in his opening statement reflecting this strategy include:
"you're going to have to decide whether the people who got immunity in this case
are telling the truth," (*Trial Tr.*, 6/6/2011, 59:25-60:2); "I suggest to you once they
get immunity, they will tell the government, the prosecutors, the agents what they
want them to - - they think they want them to say.  Otherwise, they will not be
given immunity," (*id.* at 60:14-18); and "[a]s you listen to these immunized
witnesses that have been called by the prosecutors, ask yourselves whether in an
effort to prosecute Bob Cordaro and A.J. Munchak the prosecutors gave away the
farm and what they got in exchange for witnesses who will now say anything to
protect themselves." (*Id.* at 62:12-16.)

[15]     Cordaro's statements set forth in the text were made in relation to the following
exchange with the prosecutor:

| | |
|---|---|
| Question: | Isn't it a fact, Mr. Cordaro, that under you administration with Mr. Munchak, this practice that you vowed to end of ending cronyism and awarding of lucrative county contracts to political and financial contributors - - you vowed to end that, you not only continued that practice, but you escalated it to a whole new corrupt level? |
| Answer: | Completely untrue. |
| Question: | And during your administration - - the four years of your administration, you personally got over $400,000 in either cash - - |

statements preceded any questions by the prosecution to Cordaro concerning whether a particular witness against him was lying.  Cordaro was ultimately questioned whether the following witness were lying: Michael Pasonick;[16] Al Hughes;[17] Don Kalina;[18] Joseph

---

|              | well, let's stick with cash currency.  You personally got over $400,000 in cash by shaking down various businessmen who were trying to do business with Lackawanna County. |
| Answer: | Completely false, completely false.  And you - - you and the government for whatever things they did that you had on them gave them immunity to come up here and tell this story that you wanted told, not the truth.  Contrary to prior statements they made to the government, they made to investigators that we sent to speak with them and, in fact, we had revelations and new stories come up in just the last month when you were preparing these witnesses.  That is completely categorically false. |

(*Trial Tr.*, 6/16/11, 40:20-41:16.)

[16]

| Question: | Well, if [Michael Pasonick] did give you bribes or kickbacks of a thousand dollars, he would have committed some type of criminal act? |
| Answer: | Why didn't he plead guilty to that?  That's another thing that confuses me. |
| Question: | That's not my question. |
| Answer: | Mr. Pasonick never gave me anything.  Mr. Pasonick never got work from Lackawanna County ever.  When I was - - |
| [Prosecutor]: | There's no question pending - - |
| The Court: | There is no question, Mr. Cordaro, please. |
| Question: | You say Mr. Pasonick lied about that? |
| Answer: | Completely.  Can I explain why?  Can I explain why? |

(*Trial Tr.,* 6/16/2011, 46:12-24.)

[17]

| Question: | Mr. Hughes indicated that you demanded 15,000 a month from Acker and P.J. McLaine for them to keep their contracts.  Do you remember that testimony? |
| Answer: | I heard it. |
| Question: | Didn't you tell Mr. Hughes you wanted 15,000 a month for them to keep their contracts? |
| Answer: | No, that is - - we gave them about $500,000 in contracts.  In the course of my four years as commissioner, and to imply that - - 15 - - I mean, the figures are ridiculous.  They are incredible.  They don't bear any resemblance to the work that was actually granted.  And the place where your testimony said that he received the |

Ferrario;[19] Special Agent April Phillips;[20] Marc Boriosi;[21] Shawn Tuffy;[22] John Grow;[23] James

---

    majority of his work from the watershed 2000 project was run by the Lackawanna River Sewer Basin Authority, which was never under our majority control.  We never even appointed a majority of the members on that board.  I couldn't have taken it away from them if I - -

. . .

| | |
|---|---|
| Question: | So your testimony is Mr. Hughes lied? |
| Answer: | Completely. |

(*Trial Tr.,* 6/16/2011, 49:16-50:14)

[18]

| | |
|---|---|
| Question: | [Don Kalina] said he gave you $30,000 in an envelope at Highland Associates? |
| Answer: | In the middle of 100 employees. |
| Question: | I think he said privately in an office, but the jury's recollection will control. |
| Answer: | In a glass walled conference room visible to everyone.  No, he did not. |
| Question: | He lied? |
| Answer: | Correct. |

(*Trial Tr.,* 6/16/2011, 50:19-51:2.)

[19]

| | |
|---|---|
| Question: | You said you knew that [Joe Ferrario] gave your brother cash? |
| Answer: | No, I said that I knew he gave a contribution because that's what my brother said.  I called him and thanked him.  I don't know what it consisted of.  And - - |
| Question: | When you called to thank, did you say, can you do like the last time? |
| Answer: | No, this was in October? |
| Question: | So he lied? |
| Answer: | I saw - - unfortunately not - - in addition to the immunity he was granted.  I saw what you told him that I said.  So he - - he deserved to be pretty angry about that. |
| Question: | And you mentioned here about, you know, that his reason to lie was these millions of dollars that he was stealing from the county that you alleged to the F.B.I.? |
| Answer: | I did not allege to the F.B.I.  It was a statement that you gave him prior to him giving - - because his statement to you changed from one interview to another as I understand.  And when you told him that - - but I am not aware of any other contributions. |

(*Trial Tr.,* 6/16/2011, 54:1-20.)

Finan;[24] John Heim;[25] and Thomas Dubas.[26]

---

[20]    Question:         When April Phillips testified and said she confronted you about the
                          search that the F.B.I. had just done at Mr. Costanzo - - Charlie
                          Costanzo's business, and indicated during her testimony that you
                          told her that Ferrario - - the reason that E.C.A. was on board was
                          because Ferrario had been stealing millions of dollars, that's
                          incorrect?
        Answer:           That's incorrect.
        Question:         So she lied, too?
        Answer:           That is incorrect.
        Question:         Did she lie?
        Answer:           You can characterize that any way you want.
        Question:         You never said that to her?
        Answer:           No.
        (*Trial Tr.,* 6/16/2011, 54:21-55:9.)

[21]    Question:         Mr. Boriosi testified.  I'm not saying anything.
        Answer:           I am not going to believe Mr. Boriosi.
        Question:         So he lied, too?
        Answer:           Mr. Boriosi lied for you in previous cases, too. . . .
        (*Trial Tr.,* 6/16/2011, 68:24-69:2.)

[22]    Question:         Did Mr. Tuffy lie during his testimony regarding the fact that he
                          had no position one way or the other when he got cash for a check.
        Answer:           He could remember it differently.  That's what he told me.  That
                          was the reason for the cash.
        (*Trial Tr.,* 6/16/2011, 81:15-19.)

[23]    Question:         I just said, did you negotiate the terms?
        Answer:           I knew what terms I wanted.  At some point we were fighting so
                          much that we weren't talking for a while.  I asked John [Grow] to
                          finish this up with these people, it's - - we are not getting
                          anywhere.  He finished it up, he and the solicitor, and I thought
                          some member of the board.
        Question:         So he lied, too?
        Answer:           That's not a lie.
        (*Trial Tr.,* 6/16/2011, 114:18-25.)

[24]    Question:         So if Mr. Finan testified here in this trial that you were the one who
                          told him to get rid of Kimball and hire Highland, he would be
                          lying, too?
        Answer:           He might have been threatened as we were told.  He might have

Cordaro fails to satisfy either *Strickland* prong on his claim relating to Costopoulos'

failure to object to alleged improper questioning.  First, Costopoulos' decision not to object

to these questions was sound trial strategy.  Costopoulos, while admittedly not being

_____

been threatened into changing his testimony.  That's not my recollection at all.  My recollection is exactly what I had stated that he told me we weren't going to get it done in time because Kimball wants to get out.  If Kimball wanted to stay in, we would have kept them because there was a time frame issue.  We did contracts with - - you are saying throwing Kimball out.  We did multi-million dollar contracts with Kimball.  We never kicked them out.  They hired the former majority commissioner, in fact.

(*Trial Tr.,* 6/16/2011, 123:3-15.)

[25]    Answer:       And why do you give [John Heim] an immunity deal if he didn't even give us a donation?  That was - - that was - - I mean, to say what you want him to say, that's apparently - - that's what logic would dictate here.

Question:     So he's lying, too?

Answer:       He is way off.  He's not even close.  And I - -.

(*Trial Tr.,* 6/16/2011, 138:9-14.)

[26]    Question:     In that telephone call, didn't Mr. Dubas tell you it was B.S. that he wasn't going down for you?

Answer:       He was worried about his job if he got in the middle of this issue.  I told him he made an ass of himself in newspaper saying he didn't know anything about it.  And I said, you better check with your Kimball guy - - he said, I don't have any idea, I don't remember what happened.  I said, then why say something different, call the Kimball guy and tell him.  And I said, by the way, my investigator Greg will be up to see you this week up get your statement.

Question:     So he lied also?

Answer:       He had a very different version of events than I recall.  He was more concerned about his job and getting in the middle of this and having the new administration fire him than he was with any version of events.  He didn't have a version.  I asked him to call the individual who he dealt with at Kimball, our engineering consultant, to try to figure out what had happened instead of making a fool out of himself in the newspaper.

(*Trial Tr.,* 6/16/2011, 171:11-172:3.)

familiar with the *Harris* opinion itself prior to Cordaro's trial, testified at the evidentiary hearing that he was aware that the law was that such questions were subject to objection but he intentionally did not object based on the context of the case.  He explained he did not object because the witnesses, based on the grants of immunity, were not telling the truth, were lying, and this is exactly what the defense was about.  Costopoulos sufficiently articulated his strategy for refraining from objecting to this line of questioning, and Cordaro has not shown that Costopoulos' decision to not object "could never be considered part of a sound strategy." *Thomas*, 428 F.3d at 499.  Indeed, in this case, Costopoulos explained that he did not object to the prosecutor asking Cordaro if a particular witness was lying because this was precisely the core of the defense.  In Costopoulos' words, "I intentionally did not object to those questions to Bob Cordaro because his answer to those questions was what our defense was all about, and I was not going to object to my own defense. . . . Those questions opened the door for Bob to testify to what our defense was all about and those witnesses were lying." (*Costopoulos Test.*, 20:3-12.)  This was a case of conflicting testimony; this was a case where the defense was essentially accusing the prosecution of using false testimony against the defendant, so why not say so as much as possible.  One might quarrel with Costopoulos' strategy, but I do not find it to be unsound in this case, nor do I believe that his performance fell outside the range of professionally competent assistance in light of all existing circumstances.[27]

Second, even if Costopoulos' performance was deficient in failing to object to the prosecutor asking Cordaro if other witnesses were lying and/or in failing to object to the prosecutor's closing argument, he was not prejudiced as a result.  In view of the strength of the Government's case and the number of witnesses testifying that Cordaro received

---

[27]    The same holds true of Costopoulos' decision not to object to comments by the prosecutor during closing argument.

illegal payments, there is not a reasonable probability that, but for Costopoulos' failure to object, the result of the trial would have been different. *Accord Munchak*, 527 F. App'x at 196 (addressing Cordaro's claim that the Government improperly questioned him about whether eleven witnesses were lying, and noting that "the error is not prejudicial"). Any error committed by Costopoulos in not objecting to improper questioning did not deprive Cordaro of a trial whose result is reliable.

**D.     Failure to Investigate**

Cordaro next assigns counsel's failure to investigate as unreasonable. Specifically, Cordaro emphasizes that his counsel failed to review boxes of financial records, that they did not serve a single subpoena, and that they did not interview government witnesses or defense witnesses with exculpatory information. Cordaro notes that counsel did not review the financial records of Acker Associates, McLaine, Highland Associates, Kalina, and Hughes.

"A claim of ineffective assistance of counsel for failure to investigate must, of course, satisfy both prongs of the *Strickland* test." *United States v. Franklin*, 213 F. Supp. 2d 478, 488 (E.D. Pa. 2002). Cordaro's failure to investigate claim fails to satisfy either prong of *Strickland*.

First, Cordaro has not demonstrated that his counsel's conduct fell outside the range of competent assistance in light of all the circumstances. With respect to the need for counsel to conduct pretrial investigations, *Strickland* instructs:

> [Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 691, 104 S. Ct. 2052. The Third Circuit has stated that "the 'failure to investigate a critical source of potentially exculpatory evidence may present a case of

35

constitutionally defective representation,'" and "the 'failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness.'" *United States v. Travillion*, 759 F.3d 281, 293 n.23 (3d Cir. 2014) (quoting *United States v. Baynes*, 622 F.2d 66, 69 (3d Cir. 1980); *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989)). As to the latter, "[i]neffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Gray*, 878 F.2d at 711 (citation omitted).

Here, although Cordaro argues that his counsel utterly failed to investigate this case, Costopoulos' testimony at the evidentiary hearing belies that contention. Costopoulos testified that when he was first retained, he reviewed the case with Cordaro's prior counsel. Costopoulos also reviewed the discovery provided by the Government prior to trial. He also obtained and reviewed interview reports prepared by investigator Greg Auld, including interview reports of Hughes and Kalina. Costopoulos testified that he discussed the case with Cordaro for forty hours, and that he also had discussions concerning the case with Munchak's counsel and Sal Cognetti, who was representing some of the cooperating witnesses. Costopoulos further testified that approximately a month before trial, May 3, 2011, he interviewed a number of witnesses, including Tim Earley, Bob Hastings, Tom Hastings, Ron Cordaro, Jenine Ikeler and others. In addition, prior to recommending that Cordaro enter a guilty plea, Costopoulos estimated that he spent forty to sixty hours putting the deal together.

Costopoulos' investigation of the case did not fall below an objective standard of reasonableness. As stated, Costopoulos investigated the case by, among other actions, reviewing interview reports, reviewing the discovery provided by the Government, and discussing the case with Cordaro, other attorneys, and potential witnesses. Costopoulos

36

explained that in view of the evidence he had in his possession, he did not subpoena additional documentation because he did not "believe then or now that there would be anything in those documents that would be helpful in light of the documents" he did have. (*Costopoulos Test.*, 55:6-9.)  Likewise, he testified that he did not review the materials in the boxes in the possession of the Government because he "did not believe for one second that there was anything in those boxes that was going to be exculpatory or helpful in light of what was in front of me." (*Id*. at 48:18-20.)  And, with respect to the investigation of Hughes' bank records, Costopoulos testified that he had the records that mattered to him showing checks converted to cash and that the defense was Hughes was a degenerate gambler that used the money from Acker Associates on his gambling activity and high cost of living. (*Id*. at 47:13-48:25.)  While Costopoulos could have further explored the case to satisfy his client, "his strategic choice[ ] made after thorough investigation of law and facts relevant to plausible options [is] virtually unchallengeable" because "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment support the limitation on investigation." *Strickland*, 466 U.S. at 690-91, 104 S. Ct. 2052.  In view of the information known to Costopoulos, both regarding the case generally and of Hughes' financial records in particular, his determination that it was unnecessary to investigate these matters further was reasonable.

Moreover, even if Cordaro could show deficient performance under *Strickland*, he fails to demonstrate that he was prejudiced as a result of his counsel's investigation.

> [T]o show prejudice, a defendant basing an inadequate assistance claim on his or her counsel's failure to investigate must make "a comprehensive showing as to what the investigation would have produced.  The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming its admissibility in court, would have produced a different result."

*United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (quoting *Sullivan v. Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987)); *see also United States v. Lathrop*, 634 F.3d 931, 939

(7thd Cir. 2011) ("When a petitioner alleges that counsel's failure to investigate resulted in ineffective assistance, the petitioner has the burden of providing the court with specific information as to what the investigation would have produced."); *United States v. Green*, 882 F.2d 999, 1002 (5th Cir. 1989) ("A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial."); *accord United States v. Garvin*, 270 F. App'x 141, 144 (3d Cir. 2008) ("To satisfy *Strickland*'s prejudice prong, Garvin must show that, but for his counsel's inadequate investigation, there is a reasonable probability that counsel would have found fingerprint evidence favorable to his claim of innocence, thus undermining confidence in his conviction.").

At the evidentiary hearing, Cordaro did not make a comprehensive showing of what would have resulted from a more complete investigation had his counsel served subpoenas, interviewed additional witnesses, or reviewed the boxes of information in the Government's possession.  Cordaro similarly did not attempt to make such a showing in his post-hearing memorandum.  While Cordaro repeatedly contended in that submission that a detailed investigation would have revealed valuable information (Doc. 478, 34-37), he failed to identify with particularity any evidence that would have been discovered as a result of such an investigation and how this evidence would have altered the outcome at trial. Cordaro's insistence that further investigation would have yielded crucial information is unaccompanied by any concrete or substantive details as to what would have been revealed or how the outcome would have changed by a further or more thorough investigation.  Because Cordaro fails to make such a showing, his bare claim of prejudice does not satisfy the second prong of *Strickland. See, e.g., United States v. Shetterly*, 971 F.2d 67, 75 (7th Cir. 1991) ("speculation about what evidence might have been found is insufficient to demonstrate prejudice. . . . [Petitioner] was required to make a showing of

38

what the evidence would have been and how it would have produced a different result.").

**E.      Failure to Call Witnesses**

As a corollary to his failure to investigate claim, Cordaro contends that his counsel was ineffective for failing to call witnesses to testify on his behalf.  These witnesses include, among others, Kohanski, Auld, Tom Durkin, Paul Mazzoni, and Cordaro's father. Many of the witnesses identified by Cordaro submitted affidavits in advance of the evidentiary hearing. (Docs. 457; 459.)

"The decision not to call a witness is a 'virtually unchallengeable' decision of trial strategy." *United States v. Staples*, 410 F.3d 484, 488 (8th Cir. 2005) (citation omitted); *see also United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997) ("[a] lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review.  The Constitution does not oblige counsel to present each and every witness that is suggested to him."); *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010) ("which witnesses to call is a classic tactical decision left to counsel," and "it remains a decision for counsel even when the client disagrees.").

Costopoulos' decision not to call these witnesses at trial was a reasonable strategic decision.  Kohanski, as explained above, prepared a chart, the purpose of which was to show how much cash Cordaro had available to spend in years 2004, 2005, 2006, and 2007. The Government performed an analysis which demonstrated that Cordaro expended large amounts of cash in those years.  Cordaro testified at trial about the chart.  At the evidentiary hearing, Costopoulos testified he interviewed Kohanski and decided not to call him.  He further testified that he had all of Cordaro's deposits over the four year period, but that he needed to show $700,000 in cash spent over those years and Cordaro's records did not show that amount of cash withdrawals over those years.  Further, Cordaro testified at trial that he cashed most of his county payroll checks over those four years, but it turned out that

this was not the case.  Indeed, most of these checks had been deposited.  At this hearing, Cordaro blamed his lawyers for not looking at his bank records and telling him that he deposited more than he cashed.  That Cordaro did not know that he did not cash most of the payroll checks pushes the limits of credulity.  This is especially so when the scenario of cash creation rather than bank deposits would support Cordaro's position of large amounts of available cash for him to spend, thereby negating the motive to take bribes.  This was Cordaro's defense, not one created by Costopoulos.  Moreover, Kohanski's reports failed to show a third bank account mentioned by Cordaro during this four year period.  This would have served only to further reduce the amount of cash available to Cordaro during this period.

Costopoulos adequately articulated his strategy and reasoning for not calling Kohanski to testify, including that he would have "gotten killed" on cross examination. Considering the confusion surrounding Kohanski's chart, coupled with the its continued inaccuracies despite its multiple iterations, Costopoulos' concerns with putting Kohanski on the witness stand were understandable.  Counsel's decision not to call Kohanski was not unreasonable.

Costopoulos also did not call Auld who was a private investigator who interviewed witnesses for Cordaro.  Cordaro wanted Costopoulos to call Auld to testify that Hughes told him that the Cordaro investigation was a "joke".  Costopoulos explained that he did not call Auld on this issue because the comment was made before Hughes decided to testify for the Government and against Cordaro.  This action was not unreasonable.

In addition, Cordaro asked Costopoulos to call Tom Durkin and Paul Mazzoni, and Costopoulos, while acknowledging Cordaro's request, did not call them as witnesses. Costopoulos explained that these witnesses would have testified that they were never asked by Cordaro to do anything inappropriate.  Costopoulos testified that he saw little or

no value in calling either or both of them.   Not calling Durkin and/or Mazzoni was a reasonable strategic decision.

Costopoulos also testified that he did not call Cordaro's father about a real estate transaction in which Cordaro participated because the transaction presented too many unanswered questions.  The decision not to call Cordaro's father was a tactical decision by Costopoulos and it was not unreasonable.

Cordaro also wanted Costopoulos to call a host of other witnesses.  Nothing in the record, however, indicates that Costopoulos' decisions not to call these witness was an unreasonable tactical decision.   Habeas relief on Cordaro's claim that counsel was ineffective for failing to call these witness is not appropriate.

## F.      Inconsistent Theories

Cordaro also argues that his counsel was ineffective for taking "radically inconsistent approaches to an essential issue in this case- whether Al Hughes was bribing Cordaro or merely betting with him and paying off debts." (Doc. 478, 38.)  Johnson's questioning of Cordaro was not deficient, nor was it inconsistent with the defense presented by Costopoulos.

At trial, Cordaro claimed only that $20,000 that was documented in two checks were the proceeds of lost bets.  Cordaro denied receiving any of the cash payments Hughes claimed to have given him as bribes.  Thus, Cordaro acknowledged receiving only $20,000 (which he testified were bet proceeds) of the $365,000 Hughes testified he gave to Cordaro as bribe payments.

At the evidentiary hearing, Johnson explained that he did not cross examine Hughes about the bets because he felt it would be a distraction from the defense theory that Hughes kept the payments from Acker Associates.  Johnson also stated that he thought it would make Cordaro look bad if he was betting large amounts of money.

41

"[D]eciding what questions to ask a prosecution witness on cross-examination is a matter of strategy." *United States v. Jackson*, 546 F.3d 801, 814 (7th Cir. 2008); *see also Doe v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) ("counsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must similarly meet only objectively reasonable standards."). Johnson's decision not to question Hughes as to these bets was a strategic decision entitled to deference under *Strickland*, and his cross examination of Hughes was consistent with Costopoulos' closing argument to the jury in which he argued that Hughes was using the $10,000 monthly payments to repay McLaine the money he had borrowed. (*Trial Tr.*, 6/20/2011, 49:10-25.)   Cordaro's claim that his counsel took inconsistent approaches on an essential issue in the case lacks merit and will be denied.

## G.     Cumulative Error

Cordaro's final basis for relief is his contention that even if counsel's failings individually do not warrant habeas relief, the cumulative effect of those errors necessitates a new trial.  In opposition, the Government asserts that none of Cordaro's complaints have merit individually or cumulatively.

The Third Circuit has stated that "[i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process." *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (citation omitted). "'[A] cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (quoting *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003)).  "Cumulative errors are not harmless if they had a

42

substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).  "[C]umulative error analysis only applies when [the court] identifies more than one error," *United States v. Graves*, - - - F. App'x - - -, 2015 WL 3406548, at *5 n.9 (3d Cir. May 28, 2015), and "cumulative error analysis . . . evaluate[s] only the effect of matters determined to be error, not the cumulative effect of non-errors," *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990).

Cordaro is not entitled to habeas relief on his cumulative error claim.  First, a number of actions by counsel which Cordaro characterizes as deficient did not fall outside the range of professionally competent assistance and cannot be considered in a cumulative error analysis.  Moreover, even considering the conduct of counsel which may arguably have been deficient under *Strickland* and aggregating those errors, Cordaro fails to establish actual prejudice.  The Government's case against Cordaro was overwhelming. *See Munchak*, 527 F. App'x at 196; *Cordaro*, 2012 WL 3113933, at *6.  At trial, numerous witnesses testified to making illegal payments to Cordaro.  The jury also heard recorded conversations between Cordaro and Hughes in which Cordaro berated Hughes for attempting to discuss the government's investigation over the telephone.  Even if the purported errors of counsel are combined, the substantial evidence of Cordaro's guilt in the record militates against a finding that the verdict was unreliable. *See, e.g., Smart v. Folino*, No. 10-1447, 2015 WL 1525528, at *17 (M.D. Pa. Apr. 2, 2015) ("Where weighty evidence of guilt is in the record, even in spite of all of the petitioner's alleged errors, the cumulative error standard has not been met."); *see also Fahy*, 516 F.3d at 205 ("even if we were to combine all of the prosecutor's allegedly improper remarks with the admission of Fahy's detailed confession, there is still weighty evidence of Fahy's guilt in the record."); *Alexander*

*v. Shannon*, 163 F. App'x 167, 176 (3d Cir. 2006) ("Given the strength of the evidence against Alexander, we cannot say that the alleged errors, considered together, so infected the proceedings that they denied Alexander a fundamentally fair trial.").  Cordaro will not be granted habeas relief on his cumulative error claim.

## H.    Cordaro's Supplemental Submissions

Finally, as to Cordaro's supplemental submissions, I will grant the Government's motions to strike.  These submissions were all filed without leave of court after the conclusion of the evidentiary hearing.  Cordaro provides no explanation (except for stating that in his first supplemental filing that he was present by telephone and could not communicate with counsel) as to why the content of these submissions were not explored or addressed during the evidentiary hearing.  Accordingly, consideration of these submissions in resolving Cordaro's § 2255 motion is not appropriate.

However, I will briefly address Cordaro's claims set forth in his second supplemental submission and his memorandum in response to the Order directing him to provide citations to the trial record to support the assertions in his second supplemental submission. (Docs. 500; 508.)  In those filings, Cordaro argues that a review of bank records and financial documents contradicts the trial testimony of Hughes and McLaine regarding the payments they alleged to have paid him.  Cordaro characterizes the crux of the trial testimony of these two witnesses as establishing regular payments from McLaine to Hughes to Cordaro.  But, it is argued by Cordaro, Hughes' financial records "do not support this story of routine $10,000 payments from McLaine to Hughes to Cordaro." (Doc. 508, 3.)  Cordaro points to a chart submitted by the Government at trial chronicling the payments, and he states that the chart fails to account for all of the monthly payments alleged to be made to Cordaro because there are six months listed on the chart where no payments were made by McLaine to Hughes. (*Id*. at 3-4 (citing Gov't Trial Ex. 44).)  Furthermore, that chart also

44

Case 3:10-cr-00075-ARC   Document 514   Filed 08/18/15   Page 45 of 47


depicts six months where McLaine paid Hughes less than $10,000, as well as a number of

months where the checks paid to Hughes added up to greater than this figure, which

Cordaro states is "without any specific explanation." (*Id*.)  Cordaro emphasizes that in only

two months of the entire period he was alleged to have received bribe payments did

McLaine pay Hughes exactly $10,000. (*Id*. at 4.)  In Cordaro's words, "[s]o, while both

Hughes and McLaine clearly testified to regular payments of $10,000, the evidence at trial

only showed sporadic and irregular payments between McLaine and Hughes, which were

insufficient to cover the alleged payments to Cordaro." (*Id*.)

　　　To be complete, Cordaro in these submissions attempts to hold the Government to

a regular practice of monthly payments to Cordaro from Acker through Hughes as follows:

Acker gave Hughes a check for $10,000; Hughes deposited it in his account; and then

Hughes wrote a check for $10,000 to cash from his account and gave the $10,000 to

Cordaro.  He argues that this is not what occurred, hence the Government's case collapses.

　　　This is not the evidence.  The evidence presented was that McLaine through Acker

gave Hughes checks, sometimes for $10,000, sometimes for more, sometimes for less, and

some months not at all.  At trial, when McLaine was asked whether he gave money to

Hughes on a "monthly basis," he answered:

> Just about.  There were times that - - during this period Al and I used to loan
> money to each other.  And Al, with some contacts he had would help us obtain
> tickets to different events.  And so he would get them for me, I'd reimburse
> him.  *There was always a balance running here*.  Either I owed him or he owed
> me.  *Sometimes he'd have enough that he could cover that month and he
> would do that.  But if he didn't have it he would call me and say, We need to
> meet, and I would meet with him, give him more checks*.

(*Trial Tr.*, 6/8/2011, 36:8-17 (emphasis added).)[28]  Similarly, sometimes Hughes deposited

---

[28]　　　Hughes testified similarly at trial.  For example, with regard to a payment he
received from McLaine in July 2005 which was for less than $10,000, Hughes
explained that he "probably paid some of the money out of my proceeds to make
sure that Bob got his $10,000.  I might have owed P.J. some money, or vice
versa." (*Trial Tr.*, 6/8/2011, 147:2-7.)

the checks from Acker, (*Trial Tr.*, 6/8/2011, 126:24-25 ("take them and deposit them in my account, get the checks cashed, take the money to Bob")); sometimes he cashed them, (*id.* at 127:23 (testifying that he "continued to cash the [Acker] checks and give the money to Bob").)  Hughes almost always paid Cordaro in cash, and he did not always write checks from his account. (*Id.* at 152:22-23; 154:14-15 (testifying that he paid Cordaro with checks when he did not have "cash on hand"). )  Sometimes he simply cashed the checks and gave the money to Cordaro.  Denise Cole, a special agent with the Internal Revenue Service, testified at trial that she reviewed Hughes' bank accounts to determine whether he had withdrawn enough cash to make the claimed payments to Cordaro, and her review of his records confirmed that he had withdrawn enough cash to make those payments. (*Trial Tr.*, 6/17/11, 32:6-33:1.)  There is also corroboration in the form of the 1099s from Acker to Hughes, which began after the payments commenced, and they amounted to $293,090. It is undisputed that Hughes did nothing for Acker except act as the conduit of the payments from Acker to Cordaro.   Thus, the contentions in Cordaro's second supplemental submission are without merit.

In sum, Cordaro's supplemental submissions are both untimely and fail to support his claim that his counsel was ineffective for failing to review or subpoena Hughes' financial records.  Cordaro is unable to establish that his counsel's performance was deficient for not subpoenaing these records, nor has he cited anything in those documents that shows a reasonable probability that had his counsel obtained those records the outcome of the trial would have been different.

### IV. Conclusion

The foregoing demonstrate that Cordaro was not denied the effective assistance of counsel.  Cordaro has not established that counsel's performance was unreasonable under prevailing professional norms.  Assuming *arguendo* that he did, Cordaro did not establish

that it was reasonably probable that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. 668.

Lastly, in proceedings brought pursuant to 28 U.S.C. § 2255, an applicant cannot appeal to the circuit court unless a certificate of appealability has been issued. Under 28 U.S.C. § 2253(c)(2), a court may not issue a certificate of appealability unless "the applicant has made a substantial showing of the denial of a constitutional right."   Restated, a certificate of appealability should not be issued unless "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000).  As reasonable jurists would not disagree with the resolution of Cordaro's motion, a certificate of appealability will not issue.

An appropriate order follows.


August 18, 2015                                   /s/ A. Richard Caputo
Date                                              A. Richard Caputo
                                                  United States District Judge